[No. S068536. Aug. 6, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD ALLEN McWHORTER, Defendant and Appellant.

Counsel

David S. Adams, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves, Chief Assistant Attorney General, Stan Cross, Acting Assistant Attorney General, Patrick J. Whalen and Brook Bennigson, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

BAXTER, J.—A jury convicted defendant Richard Allen McWhorter of the first degree murders of Shirley and Joey Jordan (Pen. Code, § 187),[1] and first degree residential robbery (§ 212.5, subd. (a)). Special circumstance allegations of multiple murder (§ 190.2, subd. (a)(3)) and robbery murder (§ 190.2, subd. (a)(17)(A)) were found true in connection with each count of murder.[2] After a penalty trial, the jury returned a verdict of death. The trial court denied the automatic motion to modify the penalty verdict (§ 190.4, subd. (e)) and imposed the death sentence. This appeal is automatic. (§ 1239, subd. (b).) We shall order one of the two multiple-murder special-circumstance findings and an erroneously imposed parole revocation fine stricken from the judgment, and affirm the judgment as modified.

I. Facts

A. Guilt Phase

The victims in this case, Shirley Jordan and her 10-year old son, Joey, were murdered in their Bakersfield apartment on September 11, 1995. Their badly decomposed bodies were discovered approximately one week later by friends and neighbors suspecting foul play. The prosecution's evidence, including admissible portions of defendant's taped confession, established that defendant and his wife Billie were friends and neighbors of the Jordans and had moved away from Bakersfield one week before the murders, hoping to find work in Las Vegas. Defendant, who was broke, returned alone to Bakersfield on September 11, went to the Jordans' apartment, killed mother and son, stole $3,000 from Shirley's bedroom dresser drawer, then fled the area, returning to Las Vegas that same evening.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Defendant was acquitted of the charge of first degree burglary; the related burglary-murder special-circumstance allegation was found not true.

1. *Prosecution Evidence*

a. *Defendant and his wife Billie leave Bakersfield*

In early September 1995, defendant and his wife, Billie McWhorter, lived in a small duplex at 1016 Wilson Avenue, unit B, in Oildale, a town near Bakersfield. Billie testified that Shirley Jordan and her 10-year-old son, Joey, whom they had known for several years, lived in the adjoining unit A. While neighbors they had become good friends and would often socialize together.

Billie testified neither she nor defendant was employed at that time. Their sole sources of income were unemployment and Social Security benefits, totaling $650 per month, which had run out. At the beginning of September 1995, Billie had a checking account with approximately $1 on deposit. She had been out of work since April 1994; defendant had been unemployed since early 1995.

While neighbors, Shirley told the McWhorters she had saved $7,000, and could even buy a new car if she wanted to. On July 4, 1995, Shirley lent defendant $1,500 so that he could start a landscaping business. The loan was memorialized in a written agreement signed by Shirley, defendant, and Billie, with the money to be repaid in 90 days. Defendant bought a truck and some landscaping equipment with the money but could not find any work.

In early September 1995, defendant and Billie decided to move to Las Vegas to try to find work there. As the McWhorters were broke, Shirley lent them another $350. On Monday, September 4, 1995, defendant and Billie drove to Tehachapi and spent the night with Billie's daughter and son-in-law, Brenda and James Doty. The following day, Billie stayed behind while defendant drove alone toward Las Vegas in his truck with all his landscaping equipment to look for work.

Defendant's truck broke down outside of Mojave. He called James Doty and arranged to have Doty pick up his belongings and equipment from the disabled truck. Defendant hitchhiked to Las Vegas, arriving at the home of Billie's son, Eric Roesler, in the late afternoon.

Defendant had no change of clothes when he arrived, so Roesler lent him a T-shirt with distinctive markings. Several days later, defendant told Roesler he was going back to Bakersfield to meet his mother so he could borrow money to get his truck fixed. Prior to defendant's leaving Las Vegas, Roesler gave defendant a large, white-handled knife, saying he wanted it returned.

On Sunday, September 10, 1995, defendant hitchhiked from Las Vegas to Mojave. James Doty drove to Mojave from Tehachapi and picked him up.

Defendant told Doty he came back to get a loan from his mother so he could buy another vehicle. That evening, Billie called her ex-mother-in-law, Rosalie Self, and asked Self to pick them up from the Doty residence the next morning and drive them back to Bakersfield so defendant could meet with his mother.

On Monday morning, September 11, 1995, Rosalie Self and her partner, Bob Amos, picked up defendant and Billie from Tehachapi and drove them back to their home in Oildale, which was not far from the Wilson Avenue apartment complex where the Jordans lived. Defendant left the Self/Amos residence, alone and on foot, at approximately 10:00 a.m. that same morning. He told Self and Amos his mother was going to lend him money to purchase a vehicle, and that he was going to meet her at the Yum-Yum Donut shop a short distance from their home. Billie asked to go with him, but did not.

Defendant returned at approximately 4:00 p.m. that afternoon. Billie, Self, and Amos were sitting on the porch eating hamburgers. Defendant walked over to Billie and handed her $3,000 in cash in large denomination bills ($100 and $50). Billie asked defendant why he had been gone so long; defendant claimed his mother had to go to the bank for the money.

Defendant's mother, Mary Headrick, testified that she never met with defendant on Monday, September 11, 1995; she lived in Tulare and had not traveled to Bakersfield on that date; and defendant never discussed borrowing money from her.

As the group sat on the porch, Self suggested that defendant and Billie buy a van to live in. Defendant commented that it would be cheaper to buy a van in Las Vegas and announced he and Billie were leaving for Las Vegas on a bus that same evening. Prior to leaving, Billie washed the clothes defendant was wearing while defendant took a shower and changed into clean clothes. Defendant also produced Roesler's white-handled knife, which he gave to Amos. Self and Amos then drove defendant and Billie to the bus station, where they left for Las Vegas on the 7:00 p.m. bus. Billie testified they arrived sometime after midnight and checked into a hotel. Billie's son, Eric Roesler, testified that upon their return to Las Vegas, defendant told him he had borrowed money from his mother.

b. *Discovery of the victims' bodies*

Early on the morning of Monday, September 11, 1995, 13-year-old Chris Barton called Joey to see if he wanted a ride to school. Joey and Chris were friends and schoolmates; Chris's grandmother usually drove them to school every day. Joey told Chris he was not going to school that day because he

was feeling sick. That was the last time Chris ever spoke to Joey, and she never saw Joey or his mother, Shirley, again.

Upon returning from school that afternoon, Chris called Joey and left a message on the Jordans' answering machine. A few days later, Chris went to Joey's house and knocked on the door but no one answered. Both she and her grandmother called and left additional messages on the Jordans' answering machine, but never received a return call.

Joey was absent from school on Monday, September 11, 1995, and never returned. The last day he attended school was Friday, September 8, 1995. He had been present at school every day for the two weeks prior to that date. The school attendance officer called the Jordan home each day Joey was absent, leaving messages inquiring about his absences. The calls were never returned.

On Monday, September 18, 1995, Brian LaPeer, a neighbor of the Jordans, went to their apartment after his sister-in-law noticed a bad smell emanating from the unit. He found a window open two to three inches, pried off the screen, pulled the blinds apart and saw a body lying on a bed in the bedroom. LaPeer and his sister-in-law called the police. He also noticed the Jordans' lawn was dying, which was unusual because Shirley was known to frequently water it to keep it green. LaPeer testified his young son and Joey often played together, with the last time having been three days to a week before the bodies were discovered.

Fire Captain Tom Pulcher and other fire personnel arrived at the Jordans' residence in response to the 911 call. They found the front door locked, with a window on the northwest side of the residence open several inches. The inside of the window screen was covered with flies, and a strong odor was emanating from within which Captain Pulcher associated with death. The front door was forced open and Captain Pulcher entered the apartment alone. Upon entering the apartment, he found it noticeably warmer inside than outside. He looked into the bedroom, saw the decomposing bodies of Shirley and Joey, secured the crime scene, and waited for law enforcement officers to arrive.

Kern County Sheriff's Deputy Steven Comstock was the first officer to arrive at the scene, followed by Kern County Homicide Detectives Rosemary Wahl, John Soliz, and Sergeant Glenn Johnson. Detective Wahl noticed several advertising-type newspapers had collected on the steps at the front door. She and Detective Soliz entered the apartment and observed a backpack on the living room floor with what appeared to be its contents—a purse, a pile of coupons, a notebook, two coin purses, and Shirley Jordan's checkbook register—strewn about the floor.

A prescription bottle and a yellow pillbox that had separately marked compartments for each day of the week were found on an end table. There were pills in every compartment of the pillbox except for Sunday's.

Shirley Jordan's body was found on the bedroom floor next to one of two single beds. Joey's body was spanning the two beds. Both were in an advanced state of decay.

The drawers of a dresser in the bedroom were found open. The fronts of the drawers were spattered with blood; the sides of the drawers had no blood spatter on them. Hanging out of one of the open drawers was a bedsheet or nightgown with no blood spatter on it. On the north wall next to Shirley's body was a second dresser, also with its drawers open. The wall surfaces above and next to the dresser were covered with blood spatter. Blood spatter was also found on the open door that led from the living room into the bedroom, on the doorframe, and on a vacuum cleaner in the living room near that doorway. Three strands of bloody hair were found on a bedpost. A bloody shoe print or impression was found on the floor close to where Shirley's body lay.

The back door to the residence, which was in the kitchen, was locked at the knob but not deadbolted. Two to three drops of blood spatter were found on the kitchen's linoleum floor. On one wall of the kitchen, four feet above the floor, was a large indentation in the drywall with two strands of hair stuck to the wall a short distance below it. There were no signs of forced entry into the house.

Detective Wahl found a disposable camera on a bookcase in the living room. The exposed film was later developed, revealing the last photograph taken was of defendant in the Jordans' living room, wearing the T-shirt with distinctive markings that Roesler had lent him when he first arrived on foot in Las Vegas without belongings on September 5. The Jordans' answering machine, with the various unanswered messages left on the tape starting on Monday, September 11, was also recovered as evidence.

The Jordans' apartment, unit A, was attached to unit B. Detective Wahl checked unit B, found it unoccupied, and found mail inside addressed to "McWhorter."

c. *Crime scene blood spatter evidence*

Kern County crime lab Criminalist Jeanne Spencer collected samples of blood spatter from the dresser, the door to the bedroom, a bedroom wall, the

vacuum cleaner, and the kitchen floor. Using enzyme testing, she was able to identify all the spatter as human blood that had come from the same source.

However, because no control samples were available from the victims,[3] she could not tell whose blood it was. She also collected a wadded-up paper towel from the floor of the living room and a roll of paper towels from the kitchen, both of which contained bloodstains. She likewise determined both items had human blood on them, and that the blood could have come from the same source as all the blood spatter samples.

Spencer also compared the hair strands recovered from just below the indentation in the kitchen wall, and from one of the bedposts, to both the victims' and defendant's hair samples. She found the hairs could have come from Shirley, but did not come from defendant or Joey. She noted one of the hairs had no root, suggesting it might have been torn off. Spencer also examined the white-handled knife defendant had given Amos that was recovered by police, and found no blood on it.

Supervising Criminalist Gregory Laskowski, an expert in blood spatters, stains, patterns and events, examined the scene a few days after the bodies were discovered. He identified the blood on the fronts of the dresser drawers as "medium-velocity" blood spatter events, which would be associated with kicking, bludgeoning, stabbing, or punching. He concluded the spatter patterns were probably caused by more than two or three discrete events, and that the source of the blood was "impact-generated," meaning the force that caused the spatter was moving towards the dresser. The absence of blood on the sides of the drawers evidenced that they were closed at the time of the events causing the spattering.

Blood and hairs were found adhered to a bedpost. Laskowski determined the blood on the bedpost and surrounding area had come from a source six to 10 inches away, and that the spatters were caused by mechanical force such as that associated with a punch, kick, or blow, with the blow driving the part of the body with the open wound against the bedpost.

Laskowski also observed a shoe print or impression on the carpet in the bedroom, the source or nature of which was uncertain. His initial impression was that the print may have been made by a cowboy boot. At trial, he testified the impression could also have been made by a smooth-soled shoe or boot, or possibly could have been made by a large limb like a thigh or by a knee.

---

[3] Dr. Walker, the forensic pathologist who performed the autopsies, testified there was no testable or uncontaminated blood left in the bodies given their advanced state of decomposition.

Based on his overall examination of the crime scene, Laskowski determined there were probably three to four spatter events in the area of the dresser, one to two in the area of the bedpost at the foot of one bed that contributed to the spatter stain across the bottom of the bedroom door, two to three on the north wall between the second bed and the dresser, one at the foot of the bed where Shirley's head rested, and at least one event that resulted in blood being spattered on the living room carpet outside the bedroom entryway.

### d. *Autopsy results*

Dr. Fred Walker, a forensic pathologist, performed autopsies on the bodies the day after they were discovered. Dr. Walker was employed as a medical examiner in Monterey County, had come to Kern County to fill in temporarily for another pathologist, and had previously worked as a medical examiner in Phoenix, Arizona, where he gained extensive experience working with bodies in advanced states of decomposition.

Dr. Walker acknowledged this case was particularly challenging because the advanced state of decomposition of both bodies made determining the causes of death difficult. For that reason, he visited the crime scene to gather as much relevant information as possible. He also conferred with Laskowski, reviewed the victims' medical records, and spoke with the toxicologist, who prepared no written report[4] but who orally informed Dr. Walker he had not detected any substance that would be of further significance in helping establish the causes of death.

Dr. Walker testified both bodies were in an advanced state of decomposition, with a large number of maggots on the bodies and clothing. The internal organs of both victims had "liquefied" to the point where, in Joey's case, Dr. Walker had difficulty identifying some of the vital organs. He observed a lot of tissue loss from Shirley's face, and found multiple bruises on her body. One bruise between her shoulder blades measured seven inches by three inches; one in the center of her back measured eight inches by three inches; one on her right buttock measured eight inches by four inches; one on the back of her right thigh measured two inches by two inches; one behind her right knee measured three inches by three inches; and one on her left calf measured six inches by two inches. Because of their approximate size and shape, the three "upper" bruises could have been inflicted by the same object.

---

[4] Ron Smith, the retired Kern County toxicologist who worked on the case, testified he conducted a preliminary toxicological screening and reported the results to the coroner's investigator. He prepared no formal report, due in part to the circumstance that there was very little testable material available for further toxicological screening.

Shirley's body was X-rayed. There was no evidence of broken bones or teeth. There were no obvious signs of defensive wounds to her hands or fingernails. Her clothes also appeared free of tears or holes that might have resulted from stabbing or shooting. Dr. Walker believed it more likely than not that Shirley had suffered trauma to her face, although the loss of facial tissue was likely exacerbated by subsequent maggot activity and decomposition, which would have obscured the original injury. He noted Shirley had been taking nitroglycerine, reviewed her medical records, and concluded she suffered from coronary artery disease, which itself could have made her succumb more readily to blunt force trauma injuries associated with a physically violent attack.

Joey's body was in a more advanced state of decomposition due to its smaller size. Joey had several obvious injuries to the front upper part of his body. An abraded contusion was found on his chin; this injury could have been caused by a glancing blow or a fall onto a blunt surface. He also had a large patch of skin, measuring five inches by three inches, missing at the juncture of the base of his neck and his chest, exposing his breastbone, the ends of the adjoining collar bones, and his carotid arteries and trachea. This wound area, too, evidenced considerable maggot infestation, with the advanced state of decomposition obscuring the nature or source of the injury inflicted before death.

Dr. Walker found two bruises under Joey's scalp at the back of his skull, and another bruise in the deep tissue on the left side of his neck. The pressure from a thumb, fingers, or a blow could have caused these bruises, consistent with someone's restraining or holding the victim down against the bed, possibly to smother him. As with Shirley, there was no evidence of defensive injuries observed on Joey's hands or fingernails, nor any conclusive evidence of fatal stab wounds.

Dr. Walker concluded both deaths were homicides, but because he could not determine the exact cause of either death, he certified them as "homicidal violence of [an] undetermined nature." Given the state of decomposition, Dr. Walker estimated the deaths could have occurred from two to 10 days prior to discovery of the bodies.

e. *Defendant's arrest and interrogation*

Sometime after the bodies were discovered, Billie spoke with James Doty and learned Shirley and Joey were dead. After hearing the news, she, defendant, her son Eric Roesler, and his girlfriend Sylvia sat down and tried to figure out where defendant and Billie had been when the deaths could have

occurred. Roesler testified that during this conversation, defendant expressed concern that the murder investigation might focus on him given his status as an ex-felon.

A few days later, defendant and Billie used $1,800 of their $3,000 to purchase a van in Las Vegas, and also purchased a small trailer. Shortly thereafter, Roesler and his girlfriend split up, and Roesler began living with Billie and defendant in the van. Roesler testified he did not contribute any money toward the purchase of the van or trailer.

By this time Detective Wahl had learned from the ongoing investigation that the McWhorters and Jordans had been close friends and adjacent neighbors; that defendant and Billie had vacated unit B shortly before the murders; that defendant owed Jordan $1,500, as evidenced by the signed loan note found at the crime scene; and that defendant gave Billie $3,000 on the afternoon of September 11, 1995. Detective Wahl arranged to speak with defendant and Billie on September 25. The McWhorters returned to Bakersfield and the conversation took place at the Dotys' residence in nearby Tehachapi.

Defendant told Detective Wahl he and Billie moved out of unit B, which was adjacent to the Jordans' apartment, on September 4, 1995. He claimed the last time he saw Shirley and Joey was on the day before he and Billie moved out. Detective Wahl asked defendant whether he was aware Shirley kept a large amount of cash in her apartment. Defendant acknowledged being aware of that fact, adding that Joey had remarked that his mother had a lot of money. Billie told Detective Wahl they had borrowed $1,500 from Shirley. Defendant acknowledged the signed note for the loan would be in Shirley's possession.

On October 3, 1995, Detective Wahl and Sergeant Johnson traveled to Las Vegas to again speak with defendant. Defendant, Billie, and Roesler were contacted in the parking lot of Sam's Casino, where they were living in the newly purchased van. During the conversation, defendant told Detective Wahl, in Billie's and Roesler's presence, that the three of them had pooled their money to buy the van. Defendant said they paid $1,800 for the van and did not borrow any money to purchase it. At no time during the conversation in Tehachapi or Las Vegas did defendant state he had been in the Oildale/Bakersfield area on September 11, or that he had borrowed additional money from Shirley Jordan on that date.

### f. The first taped statement/confession

The following day, October 4, 1995, defendant was arrested for murder and taken to a Las Vegas police station, where he waived his *Miranda* rights

(*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602])
and agreed to give a tape-recorded statement to Detective Wahl and Sergeant
Johnson.

Defendant again stated he and Billie moved from Wilson Avenue on
September 4, 1995. Billie stayed behind in Tehachapi at her daughter Brenda
Doty's home, while defendant drove to Las Vegas to look for landscaping
work. His truck broke down en route and he hitchhiked the rest of the way to
Las Vegas, where he stayed with Billie's son Eric for four or five nights. He
hitchhiked back to Tehachapi the following Sunday. Self and Amos picked up
Billie and defendant the next morning, Monday, September 11, and they
returned to the Self/Amos residence in Oildale. Defendant stated he left the
residence alone around noon, walked around the neighborhood looking for a
truck to purchase, and returned at 2:00 p.m., after which he and Billie left on
the 7:00 p.m. bus for Las Vegas.

Defendant stated they bought the van on Wednesday, September 13, for
$1,800 in cash, and began living in it. The money used to purchase the van
came from his hitting several casino jackpots and finding $200 in the casino
bathroom, plus $900 that Eric put in as a "50/50" partner in defendant's new
landscaping business.

Defendant again stated the last time he saw the Jordans was the morning
before he and Billie moved out of Unit B. He denied returning to the Jordans'
apartment on Monday, September 11. He denied he and Billie were in need of
money, claiming they had $1,600 to $1,800 in cash when they moved out.
The detectives had learned defendant and Billie had not paid their September
rent upon moving.

Defendant was confronted with the fact he had lied by failing to relate that
he returned to the Self/Amos residence on Monday, September 11, with
$3,000 which he gave to Billie, falsely telling her and the others that he had
borrowed it from his mother. Detective Wahl and Sergeant Johnson told
defendant they believed he killed Shirley and Joey Jordan because he was
broke and needed money. At first defendant denied it. Upon further question-
ing, he admitted he lied about borrowing the $3,000 from his mother, but·did
not explain from where he obtained the money. He acknowledged knowing
Shirley kept a lot of cash in her residence, and volunteered his opinion that
she was extremely frugal.

As the questioning continued, defendant ultimately admitted to killing Shirley and Joey.[5] He stated he went to see Shirley on September 11, that they sat and talked for a while, and that at some point he pulled out the knife Roesler had given him and demanded money from her. He stated they struggled and he first stabbed her, and then stabbed Joey. He washed the blood off the knife, returned to the Self/Amos residence, and gave the knife to Bob Amos.

As the interview continued, defendant provided additional details. He explained that Shirley had invited him in through the back door and he was surprised to see Joey home from school. He told Shirley he and Billie were "having it pretty rough" and needed to borrow some more money. Shirley responded by stating, "You guys are draining me." She went into the kitchen and when she returned, defendant stood up, pulled out the knife Eric had lent him, told her he was desperate, and demanded all the money in the house. He grabbed her, stating, "Shirley, I don't want to hurt you. Now just tell me where the money is." She did not comply; they started wrestling on the floor, at which point he "whacked" her a couple of times. He then "lost it" as Joey came running out. He grabbed Joey, they all fell to the floor, and he stabbed Shirley in the chest. He then decided he had to kill Joey to prevent him from being a witness to the crime. Defendant claimed he stabbed both victims in the living room and left their bodies in that room.

Defendant then entered the bedroom and found the money in a dresser drawer. He washed the blood off his hands and knife in the kitchen sink, left through the back door, and returned to the Self/Amos residence, where he gave Billie the money and Amos the knife. He showered and changed his clothes, then he and Billie took a bus to Las Vegas that same evening.

When confronted with the fact that the bodies were found in the bedroom and not the living room, defendant insisted he killed both victims in the living room, then sat watching them for a long time after they were dead.

Finally, defendant admitted he lied when he said he and Billie had $1,800 at the time they moved out, and lied about Eric going in "50/50" with him on the van. He also admitted he was broke when he killed Shirley and Joey.

g. *The second taped statement/recantation*

On October 12, 1995, eight days after defendant confessed to the murders, Kern County Sheriff's Detective John Soliz went to Las Vegas to reinterview

---

[5] Facts from the interrogation relevant to defendant's claim that his confession to the murders was coerced, and that he made it up solely to obtain lenient treatment for his wife Billie, are discussed in greater detail in connection with that claim.

defendant at the request of the district attorney who charged the case. Detective Soliz had had no prior contacts with defendant. During this second interview, defendant recanted much of his earlier statement, now claiming he did not know how the Jordans were killed, and asserting he made up the version of events he told the detectives one week earlier "to keep my wife from going to jail."[6] Defendant now claimed, "I was scared to death to even talk to them other officers[s] and then when they got me up here that night badgering me, I just made up that story."

Defendant now claimed that after leaving the Self/Amos residence on Monday morning, September 11, after telling Billie he was going to meet his mother to borrow money, he realized she would not lend him any money so he decided to ask Shirley for a loan. He arrived at Shirley's apartment between 11:00 and 11:30 a.m. They had coffee, he told her his truck had broken down, and he asked her for a $3,000 loan. She entered her bedroom, closed the door, and returned with $3,000, which she gave to him, stating she had an additional $4,300 in reserve at that time. No such sum of money was found in the apartment after the murders. Defendant explained he did not tell Detective Wahl and Sergeant Johnson about this loan because he was scared: "I mean just, I don't know why. I'm an ex-con, scared to death. I mean a murder was committed." After Shirley lent him the money they talked some more and Joey took defendant's picture with a disposable camera. He left the Jordans' apartment at 1:30 or 2:00 p.m. The reason he lied to Billie about where he had obtained the $3,000 was because she was a jealous woman and he did not want her to think he and Shirley were having an affair. At the conclusion of the interview defendant again insisted he did not kill Shirley or Joey and did not know who did.

### 2. *Defense Evidence*

Angelica Herrera was a close friend of both Shirley and the McWhorters. Herrera testified Shirley had in the past mentioned what a good friend defendant was, how she liked having him around to fix things, and how well defendant got along with Joey. Herrera also testified Billie was jealous toward defendant, recounting that once Billie had gotten mad at Herrera for hugging defendant in what Billie felt was an inappropriate manner.

Cynthia Durham had known Shirley for seven or eight years, from the time the two were neighbors in another Wilson Avenue apartment complex—1319 Wilson Avenue. Although claiming they had been best friends and had seen each other every day, Durham was unaware Shirley had moved to 1016 Wilson Avenue until months after she moved.

---

[6] Defendant does not claim the second taped interview was itself coercive, and concedes he properly waived his *Miranda* rights prior to furnishing the second statement.

Durham testified Shirley came to her house on the morning of September 11, which was Durham's son's birthday, and asked if Durham and the boys wanted to meet for pizza that evening. She testified Shirley then called her between 4:00 and 4:30 p.m. that same afternoon, sounded nervous and scared, cancelled the plans because something had come up, and hung up quickly before Durham could learn what was going on. Durham claimed she tried to call Shirley back, got the answering machine, and left a message. Durham acknowledged talking to Detective Soliz shortly after she learned of the Jordans' deaths, but denied telling him that the pizza date she and Shirley had planned was in August.[7]

Dr. Michael Baden, a forensic pathologist and private defense consultant in this case, testified the most common cause of multiple deaths, where there is no other obvious cause, is carbon monoxide poisoning. Based on his review of the photographs of the crime scene and Dr. Walker's autopsy report, he believed both deaths were the result of asphyxia caused by carbon monoxide poisoning. He also believed the bodies were only in the "beginning" stages of decomposition, estimating the deaths had occurred three to five days prior to their discovery. Dr. Baden also concluded the many bruises Dr. Walker identified on Shirley's body were not sustained while she was alive, but rather were "postmortem artifacts."

Defendant's wife Billie (who had cooperated with and testified for the prosecution) was called by the defense to testify that when they moved out of unit B, defendant moved a washing machine into the storage shed adjacent to the Jordans' Unit A. She recalled defendant "bumped" a gas valve connected to the adjoining water heater, which caused a momentary gas leak until he could shut the valve and tighten it, "and then it was okay."

David Faulkner, a forensic entomologist with the San Diego Natural History Museum, testified about the use of insects to determine time of death in homicide cases. Approximately two years after the murders, Faulkner viewed photographs of the crime scene and examined Shirley's clothes, on which he found crushed insect remains. Using these insect remains, which he assumed had been crushed at the time Shirley's body was removed from the scene, and ambient temperature data gleaned from weather reports for the relevant time period, Faulkner estimated the victims' deaths occurred four to five days before the bodies were discovered on September 18.

Rod Englert, a retired law enforcement officer and private forensic consultant, testified for the defense regarding the blood spatter evidence at the crime

---

[7] No message from Durham was found on the Jordans' answering machine after the murders. Detective Soliz testified on rebuttal that he spoke with Durham two days after discovery of the bodies, at which time she told him the last time she talked to Shirley was "last month," meaning August, when they discussed meeting with their boys for pizza.

scene. After reviewing the police and autopsy reports and photographs of the scene, Englert concluded the evidence of each of the distinct blood spatter events in the bedroom, except for one, was inconsistent with "cast off" spatter caused by blunt trauma, and consistent with spatter caused by "expectorated" (i.e., coughed-up) blood. Englert could not, however, explain the several drops of blood found on a wall near a fan that had been knocked over in the bedroom, which clearly was "cast off" spatter.

Englert believed the bloodstained, wadded-up paper towel found in the living room had a "nasal blowing pattern" indicating it had been used by someone with blood coming from his or her nose. Ultimately, it was Englert's opinion that Shirley "was coming out of the bathroom on her hands and knees when she turned and coughed that blood against the dresser, and proceeded forward and either coughed it to the right or to the left, moving about."

### 3. *Prosecution Rebuttal Evidence*

Dr. Robert Hall, a professor of entomology from the University of Missouri and an expert in the field of forensic entomology, reviewed the materials in the case and defense witness Faulkner's conclusions about estimating the time of death through examination of the dead insect remains. Dr. Hall testified that the fact the crushed insect specimens were not properly collected or preserved injected uncertainty into any estimation of how long the insects had lived, and that any conclusion as to when the insects died was pure speculation. He also testified there was no way to discern how long it took the insects to find and reach the bodies inside the residence, and that Faulkner's assumption that they had accessed the body within an hour was sheer speculation. Dr. Hall concluded that "the entomological evidence in this case cannot rule out a seven-day time frame."[8]

Criminalist Laskowski was also recalled and testified the bloodstains on the paper towels found in the living room were clearly transfer stains and did not come from someone blowing his or her nose and expectorating blood into the towels.

---

[8] The defense then presented a surrebuttal witness, Dr. Neal Haskell, a "private international forensic entomology consultant," who agreed with defense expert Faulkner that, based on the dead insect remains, the victims had died approximately four to five days prior to discovery of the bodies.

## B. Penalty Phase

### 1. *Prosecution Evidence*

Evidence was introduced that defendant had previously suffered felony convictions of grand theft person in 1977, forgery and felon in possession of a weapon in 1984, and robbery in 1985. Additionally, defendant was committed to the California Youth Authority for a term of 11 months for burglary when he was 15 years old.

One of the victims of the 1985 robbery, Terry Wendt, testified about defendant's conduct in perpetrating that crime. On January 18, 1985, Wendt was working as a bartender in Redding, California. His girlfriend was also present in the bar that evening. Defendant entered the bar, produced a gun, ordered them into the bathroom, at one point cocked the gun while pointing it at Wendt, kicked Wendt in the groin, and then stole money and other items from the bar before fleeing.

Walter Newport, a former police officer for the City of Bakersfield, testified about events underlying defendant's conviction of grand theft person from Alvin Tepel in January 1977. Newport testified that Tepel suffered lacerations on his head, two black eyes, a bloody mouth, and a missing front tooth; the interior of Tepel's residence was found covered with bloodstains; and Tepel had to be transported to the hospital as a result of the incident.

### 2. *Defense Evidence*

Defendant's mother, Mary Headrick, testified defendant was 50 years old at the time of trial and he was one of two sons born during her marriage to Aulvis McWhorter. Shortly after the children were born, the McWhorters split up and Headrick married Frank Heath, with whom she had two more children.

Heath was an alcoholic and both physically and mentally abusive to Headrick and her two sons from her first marriage. He would beat defendant and his brother Troy and he beat her in front of them as well. She recounted one incident in which Heath cut the heads off the family's pet chickens. Headrick testified she called the police "[t]oo many times to remember" in connection with the beatings. When defendant was in fifth grade, Headrick moved numerous times to get away from Heath, but he would find out where they lived, "sweet talk" his way back into their lives, and the cycle of drinking and violence would begin anew. Headrick testified Heath would single out defendant for beatings, that defendant would never cry, and that over time defendant seemed to become "a loner."

Headrick and Heath separated when defendant was 12 or 13 years old. Headrick testified defendant was a good-hearted child, was never disrespectful, helped her with her other children, cleaned the kitchen, cooked, and ironed clothes.

Defendant's brother, Troy McWhorter, testified about his and defendant's upbringing in the home of their stepfather, Frank Heath. Troy ultimately dropped out of high school, joined the military and served in Vietnam, married, had two children, and became an engineering supervisor for a railroad, where he worked for the next 30 years. At the time of trial he had been married for 31 years and had been a reserve deputy for the Kern County Sheriff's Department for 21 years.

Troy testified Heath was an alcoholic who was intoxicated most of the time, and described him as a mean man who was physically and mentally abusive. Life with Heath was "horrendous." Heath would single out defendant for beatings because he looked like his father. When Heath beat the boys, he would pull them by their hair and kick them like a football. Once, when defendant was three years old, Heath forced him to eat chili peppers until he cried. Troy recalled calling the police on Heath when he beat their mother. He recalled the occasion when Heath killed the family's chickens and made him and defendant pluck them, and another occasion when Heath killed their pet rabbit in front of them, nailed it to a wall, then ate it for dinner.

Troy testified defendant got married when he was 18 and had subsequently been divorced and remarried several more times. Defendant had three children from his prior marriages, with whom he was not close. Troy was not aware that defendant had been convicted of robbery in Shasta County or grand theft in Kern County.

Dr. William Pierce, a clinical psychologist, was hired by the defense to develop a psychological and social profile of defendant. He interviewed defendant, his mother, his brother, an ex-wife, and his friend Angelica Herrera, reviewed materials relating to defendant's prior incarcerations, and conducted a series of psychological tests. Dr. Pierce concluded defendant showed no signs of organic brain damage or injury, was of average intelligence, was emotionally constricted, and had difficulty when tasks became too complex or ambiguous. He further believed defendant would adjust well to structured prison life.

William Reinhart, a former warden of Eagle Mountain Community Correctional Facility, a private prison in Desert Center, California, reviewed defendant's Department of Corrections and Rehabilitation files. Reinhart felt defendant could adapt well to prison life and, if he were sentenced to life

without the possibility of parole, would likely be assigned to a "level 4" facility with numerous restrictions placed on him.

## II. DISCUSSION

### A. Jury Selection Issues

#### 1. *Death Qualification of Jurors*

Defendant contends he was denied his constitutional right to an impartial jury when the trial court excused for cause two prospective jurors, Robert C. and Margaret P., who expressed strong reservations about their ability to vote for the death penalty. We find no error.

■ A trial court may discharge a juror whose views on the death penalty would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844]; see *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1146 [36 Cal.Rptr.2d 235, 885 P.2d 1] (*Rodrigues*).) A prospective juror can properly be excused for cause if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1114 [74 Cal.Rptr.2d 121, 954 P.2d 384]; *Rodrigues, supra*, 8 Cal.4th at p. 1146.) There is no requirement that the prospective juror's bias against the death penalty be proved with unmistakable clarity. (*Wainwright v. Witt, supra*, 469 U.S. at p. 424.) Rather, the trial judge need only determine that the prospective juror would be unable to faithfully and impartially apply the law in the case before him or her. (*Rodrigues, supra*, 8 Cal.4th at p. 1147.)

#### 2. *Prospective Juror Robert C.*

In responding to the jury questionnaire about his views on the death penalty, Prospective Juror Robert C. indicated, "I'm not sure what my feelings [about the death penalty] are." He checked a box indicating he "might be able to vote to impose the death penalty in an appropriate case depending on the facts and circumstances."

During sequestered *Hovey* voir dire (*Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301]), the trial court explained the process of weighing aggravating and mitigating factors toward reaching a penalty determination. When asked if he was a person who could go through such a process before making a decision about imposing the death penalty, Robert C. opined that he was not. When asked if he could vote to impose the

death penalty if the aggravating circumstances outweighed the mitigating circumstances, he responded, "I'm not sure I could." When pressed further as to whether he could ever vote for death where "appropriate," he responded, "I don't know if I could come to that conclusion. I don't know." He further indicated his church was opposed to the death penalty and that he would feel "uncomfortable" trying to set aside his faith in voting to impose death. When asked by the court, "[C]an you write down on a piece of paper, for example, death penalty is appropriate and say that in open court?" he responded, "I don't know if I can." When asked, "You can't make a commitment as to whether or not you could do or you could say death is appropriate. Is that just kind of the bottom line?" he responded affirmatively.

### 3. *Prospective Juror Margaret P.*

In responding to the jury questionnaire about her views on the death penalty, Prospective Juror Margaret P. indicated she had "mixed feelings" about it and that "jurors should not have the burden of deciding if another person lives or dies." She further indicated she had told her husband that she "never wanted to be on a trial where a death penalty was determined by a jury." She concluded by writing, "Even if I agreed to a guilty verdict, I would find it very difficult to impose the death penalty—it is a decision I would rather not make."

During sequestered voir dire, Margaret P. reaffirmed her responses to the death penalty questions in the jury questionnaire. She told the trial court she felt "very strongly" that jurors should not have to make a decision involving the death penalty; that she did not know if she could do it; and that she would rather have the judge determine the appropriate sentence. When asked by the court if she would follow the law regardless of her feelings, she responded, "I honestly don't know." When asked by the prosecutor if she could "as a personal decision that you need to make" ever vote for the death penalty in an appropriate case, she replied, "The way I feel about it, I could not make that decision."

The high court has explained that even where a juror gives ambiguous or conflicting answers to inquiries about his or her views on the death penalty, the trial court is in the best position to evaluate those responses, and its determination as to the juror's actual state of mind is binding on appeal. (*Wainwright v. Witt, supra,* 469 U.S. at pp. 428–429; see *People v. Phillips* (2000) 22 Cal.4th 226, 234 [92 Cal.Rptr.2d 58, 991 P.2d 145]; *Rodrigues, supra,* 8 Cal.4th at p. 1147.) Any ambiguities in the record are to be resolved in favor of the trial court's determinations, and the reviewing court determines only whether the trial court's findings are fairly supported by the record. (*People v. Crittenden* (1994) 9 Cal.4th 83, 122 [36 Cal.Rptr.2d 474,

885 P.2d 887]; *People v. Howard* (1988) 44 Cal.3d 375, 417–418 [243 Cal.Rptr. 842, 749 P.2d 279].)

Manifestly, neither of these two prospective jurors was improperly excused for cause.[9]

## B. Guilt Phase Issues

### 1. *Voluntariness of First Statement (Confession)*

Defendant claims his confession was coerced and that the trial court erred by finding only the latter portion of the taped statement involuntary and inadmissible. Specifically, he claims Detective Wahl and Sergeant Johnson threatened to hold his wife Billie in custody and charge her as an accessory to his crimes if he did not confess; threatened to involve his mother by calling her as a witness in the case; and lied to him when indicating they had a witness who had seen him near the Jordans' apartment on the day in question. Defendant argues further that the trial court did not properly consider the totality of circumstances in determining voluntariness when it ruled only the second portion of his taped statement involuntary and inadmissible.

### a. *Background*

### 1. *Motion to exclude confession and recantation*

Defendant filed a pretrial motion to exclude his confession (first statement, Oct. 4, 1995) and subsequent recantation (second statement, Oct. 12, 1995) on grounds they were coerced, involuntary, unreliable, and untrue. At the hearing on the motion the parties stipulated he had validly waived his *Miranda* rights before each interview.

Sergeant Johnson testified for the prosecution at the hearing on the motion. He recalled advising defendant he had a warrant for his arrest for murder and transporting him to a Las Vegas police station. He also advised Billie McWhorter and Eric Roesler of defendant's arrest, telling them he wanted to talk with them about any additional knowledge they might have regarding the

---

[9] Defendant's further claim, that the standard California courts apply to this issue is different from, and fails to comport with, that applied by the high court in *Gray v. Mississippi* (1987) 481 U.S. 648 [95 L.Ed.2d 622, 107 S.Ct. 2045] and *Adams v. Texas* (1980) 448 U.S. 38 [65 L.Ed.2d 581, 100 S.Ct. 2521], has previously been rejected by this court. (See *People v. Schmeck* (2005) 37 Cal.4th 240, 263 [33 Cal.Rptr.3d 397, 118 P.3d 451].)

murders. Sergeant Johnson testified Billie voluntarily agreed to be interviewed and was transported to a Las Vegas police station for that purpose.[10]

Sergeant Johnson testified that, at the time, he believed Billie was very possibly a coconspirator in defendant's crimes. The detective had learned from other relatives that defendant told them he received $3,000 from his mother when he was in Bakersfield, had given the money to Billie, and had then used the money to buy a van and a trailer. Johnson testified that in speaking with defendant the evening before his arrest, defendant, in Billie's presence, had stated that he, Billie, and Roesler had pooled their money to buy the van upon arriving in Las Vegas. Defendant said nothing about borrowing money from his mother. The fact that Billie at times may have had possession of the stolen money, and the fact that she did not correct defendant when he made the false statement to the detectives about the alleged source of the money used to buy the van, led Sergeant Johnson to suspect Billie herself may have been implicated in some way in the criminal episode.

In support of the motion, the defense called Dr. Stephen Estner, a forensic psychiatrist. In preparation for his testimony at the hearing, Dr. Estner had reviewed the transcript and audiotape of defendant's statement and met with him for several hours to discuss the circumstances of his confession. Dr. Estner found defendant did not suffer from any mental abnormalities but "has a very big soft spot regarding Billie."

Dr. Estner reviewed portions of defendant's first taped statement, identifying the areas where he believed Detective Wahl and Sergeant Johnson had made comments intended to play into defendant's sensitivities concerning his family members. He identified one instance where Sergeant Johnson told defendant he had read in a newspaper that his brother, Troy McWhorter, whom Johnson knew, had recently undergone triple bypass surgery. Dr. Estner found this significant because defendant had sensitivities about his brother, given the extent to which their lives had diverged—with defendant's having a history of run-ins with the law while Troy had become a law enforcement officer.

Dr. Estner also identified instances in which he believed Sergeant Johnson was playing on defendant's sensitivity to the possibility his mother would become involved in the case. In one instance Sergeant Johnson told defendant he was dragging his family into the investigation. In another he suggested defendant himself had involved his mother as a potential witness by lying about meeting and borrowing money from her on September 11. In another

---

[10] Billie's trial testimony confirmed she was not arrested or taken into custody; she voluntarily agreed to go to the police station to furnish a statement and was told that afterwards she would be returned to the van.

instance, Johnson suggested to defendant that unless he confessed his mother would become a witness and would have to "ride this roller coaster with you." In another he told defendant he had "sucked" his mother and Billie into the situation and was pulling everyone down around him. Dr. Estner also noted an instance where defendant told the officers he did not want his mother involved and Detective Wahl pointed out that she was going to have to become involved unless he told them the truth.

Dr. Estner also pointed to exchanges concerning Billie's possible complicity in the crimes. In one instance, Detective Wahl told defendant she was not convinced Billie was not somehow involved in the crimes, and had not yet decided if Billie was "going to go with you too." In another, Sergeant Johnson suggested Billie might be an accessory after the fact, which Estner believed was the point at which defendant became consciously aware of the officers attempting to use Billie to pressure him to confess. In another, Sergeant Johnson put further pressure on defendant when he told him, "the ball's in your court."

Finally, Dr. Estner identified Sergeant Johnson's comment to defendant at page 86 of the transcript, "You have my word as a man to man that she [Billie] goes if you give me enough details about the homicides that I can show . . . ," as the point at which defendant "gets the message" that he could save Billie by making a detailed confession. Dr. Estner concluded defendant's will was psychologically and emotionally overborne to the point where he believed he could protect Billie and his other family members only by confessing.

## 2. Trial court's ruling

The trial court found the first portion of the first taped statement, up to Sergeant Johnson's comment about letting Billie go, which included defendant's summary confession to having killed Shirley and Joey Jordan, to be neither coerced nor involuntary. Specifically, the trial court disagreed with defendant's claim that Detective Wahl or Sergeant Johnson had improperly used Billie as leverage to coerce him into confessing to the murders during that first portion of the interview. The court gave the following reasons for its conclusion: "[T]he Court [is] of the opinion that the officer is accurately, Officer Johnson is accurately telling the defendant that he will consider what information he has which might relate to [Billie's] involvement in any of the events, particularly those events after the killing, and it is quite clear that the scenario as, as presented to the defendant and the theory outlined by Officer Johnson was . . . that Billie was in possession of [a] large sum of money [a] short period of time after the killing and was continuously with the defendant for [a] period of several days thereafter, during which time, of course, that

money was spent to buy a vehicle and a trailer. And that, of course, that scenario as painted was [a] scenario [of] Billie being a person who was benefitting from the large amount of money that had been possessed by the defendant in a manner in which was apparently unexplained to the investigators and unaccounted for to the investigators relative to Billie's possession thereof or involvement in the spending thereof or her knowledge of that money being used and spent for the van and trailer. Obviously, she was with Mr. McWhorter throughout all of that process and was benefitting from the purchase of the van, driving in it, residing in it, and so, of course, quite clearly the question is whether she was a person who knowingly was in possession of stolen property or property that had been purchased and is now possessed resulting from [a] large amount of cash that, obviously, inferentially she should [have] known or could [have] known or actually did know was the result of illegal activities of Mr. McWhorter. And if to what extent she knew that or had knowledge of that, what was that knowledge as to the means or the way in which he came in possession of that large sum of money, in excess of some $3,000."

In contrast, the court found the second portion of the statement, everything following Sergeant Johnson's comment to defendant about letting Billie go, to have been induced by a clearly expressed promise of benefit to Billie and therefore inadmissible. The court gave the following reasons for that conclusion: "Now at the top of page 86, however, the nature of the colloquy changes, and the defendant, Mr. McWhorter, specifically asks a very direct question, 'I've got your word she's gone, she gets to go?' And both of the officers specifically and directly answer, yes. Now up and until that time the Court's of the considered opinion, although certainly the evidence is . . . very, spread over, of course, approximately 40 pages, the Court is of the opinion up and until that time there was no promise of benefit that induced the statement or any statements theretofore made or implied promise of benefit, the officers appropriately interchanged with the defendant and discussed with the defendant what . . . information that he might provide might be probative of or helpful of. [¶] Nevertheless, at this point they specifically give him the promise that she would be released if he continued to give additional statements thereafter. [¶] And the Court's of the opinion that there was a promise of benefit made at that point and that the promise of benefit was so clear and specific that statements made by the defendant thereafter are involuntarily obtained, and therefore, statements made after, after that exchange as reflected at page 86 of the transcript lines one and two are inadmissible because of . . . their being involuntarily obtained."[11]

---

[11] The court also found the second taped statement (recantation) sufficiently attenuated from the first and thus voluntary and admissible.

Defendant's trial counsel thereafter informed the court that in light of its ruling the defense was electing to introduce the entirety of the first taped statement to the jury, including the second portion that the court had ruled involuntary and inadmissible, to give the jury "a full flavor of what transpired" during the interview. Counsel explained this decision as a tactical one, intended to show the jury that defendant's confession was not reliable because the details he gave about the crime scene and manner of death were at odds with the facts of the case. The court determined the decision was a matter of trial tactics and confirmed for the record that defendant understood and consented to it.[12]

Accordingly, defendant's claim is that the first portion of the statement, up to Sergeant Johnson's comment about letting Billie go and including his initial summary confession, should have also been found coerced and involuntary, and therefore inadmissible.

b. *Applicable law*

■ The law governing voluntariness of confessions is settled. "In reviewing the voluntary character of incriminating statements, ' "[t]his court must examine the uncontradicted facts surrounding the making of the statements to determine independently whether the prosecution met its burden and proved that the statements were voluntarily given without previous inducement, intimidation or threat. [Citations.] With respect to the conflicting testimony, the court must 'accept that version of events which is most favorable to the People, to the extent that it is supported by the record.' " ([*People v. Hogan* (1982) 31 Cal.3d 815,] 835 [183 Cal.Rptr. 817, 647 P.2d 93].)' (*People v. Thompson* (1990) 50 Cal.3d 134, 166 [266 Cal.Rptr. 309, 785 P.2d 857].) 'In order to introduce a defendant's statement into evidence, the People must prove by a preponderance of the evidence that the statement was voluntary. [Citation.] . . . When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness.' (*People v. Vasila* (1995) 38 Cal.App.4th 865, 873 [45 Cal.Rptr.2d 355].)" (*People v. Maury* (2003) 30 Cal.4th 342, 404 [133 Cal.Rptr.2d 561, 68 P.3d 1] (*Maury*).)

"A statement is involuntary if it is not the product of ' "a rational intellect and free will." ' (*Mincey v. Arizona* (1978) 437 U.S. 385, 398 [57 L.Ed.2d 290, 98 S.Ct. 2408].) The test for determining whether a confession is voluntary is

---

[12] The court also gave a limiting instruction, requested by the defense, that told the jury they could consider the second portion of the statement (after Sergeant Johnson's comment on p. 86) only "for the limited purpose of showing, if it does, that the assertions made by Mr. McWhorter in part I of the conversations were false or untrustworthy."

whether the defendant's 'will was overborne at the time he confessed.' (*Lynumn v. Illinois* (1963) 372 U.S. 528, 534 [9 L.Ed.2d 922, 83 S.Ct. 917].) ' "The question posed by the due process clause in cases of claimed psychological coercion is whether the influences brought to bear upon the accused were 'such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.' [Citation.]" [Citation.] In determining whether or not an accused's will was overborne, "an examination must be made of 'all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.' [Citation.]" [Citation.]' (*People v. Thompson, supra,* 50 Cal.3d at p. 166.)" (*Maury, supra,* 30 Cal.4th at p. 404.)

"A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions. (*People v. Benson* (1990) 52 Cal.3d 754, 778 [276 Cal.Rptr. 827, 802 P.2d 330], citing *Colorado v. Connelly* [(1986)] 479 U.S. [157,] 167 [93 L.Ed.2d 473, 107 S.Ct. 515].) A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. (*Benson, supra,* at p. 778.) Although coercive police activity is a necessary predicate to establish an involuntary confession, it 'does not itself compel a finding that a resulting confession is involuntary.' (*People v. Bradford* (1997) 14 Cal.4th 1005, 1041 [60 Cal.Rptr.2d 225, 929 P.2d 544].) The statement and the inducement must be causally linked. (*Benson, supra,* at pp. 778–779.)" (*Maury, supra,* 30 Cal.4th at pp. 404–405.)

c. *Discussion*

Defendant first argues the trial court's ruling itself reflects the court did not properly consider the totality of circumstances because it found only the second portion of the first statement to be coerced, involuntary and inadmissible. He contends that instead of examining the totality of circumstances surrounding the confession, the trial court "scoured the record" to find a promise of benefit, which it believed was a prerequisite for finding the statement coerced. Defendant concludes that the court, in so doing, "narrowed the test for voluntariness and committed reversible error."

The record belies the claim. In ruling on the motion, the trial court indicated it had carefully reviewed the transcript of the first statement as well as listened to the audiotape. The court's detailed explanation of its ruling on the motion alone spans nearly 20 pages of the reporter's transcript. In the course of that ruling, the court stated for the record its understanding that "the statement and the colloquy between an officer and a defendant and the interactions and what is said respectively and the way the statement develops is, of course, to be taken in its entirety and not to be taken in isolated segments, but is to be viewed contextually and to be viewed as a

whole and not in snippets or parts, but should be viewed in its entirety, and that, of course, is what the Court has done." Our own independent review of the record confirms that the court exhaustively considered every aspect of defendant's claim that the officers, through their questioning and references to defendant's family members, unduly coerced him into confessing to the murders.

The fact that the trial court ultimately focused on Sergeant Johnson's unequivocal "promise of benefit" to let Billie go if defendant furnished enough details about the homicides, and the court's determination to exclude as involuntary only that portion of the statement following Sergeant Johnson's remark, do not establish that the court failed to consider the totality of circumstances in reaching its ruling. Defendant would seemingly have us conclude that faithful adherence to the totality of circumstances test requires that *the entirety of any taped interrogation* giving rise to an incriminating statement later challenged on voluntariness grounds must be found either wholly admissible or wholly excludable, but he cites no precedent in support of that inflexible proposition. As will be shown, our own independent review of the totality of circumstances surrounding the first interview convinces us that, up to the point where Sergeant Johnson made the comment about letting Billie go, all of defendant's statement, including his initial summary confession to having killed the victims, was established to have been freely and voluntarily given.

Defendant claims the detectives "threatened" to call his mother as a witness in the case unless he confessed. The matter arose when Sergeant Johnson told defendant the police knew he was lying when he claimed he met his mother and borrowed $3,000 from her in Bakersfield on September 11. Defendant responded that he did not want his mother involved. Sergeant Johnson at one point commented to defendant, "Like I say, you know. Yes, we're gonna talk to your mom. Because, because you, you pulled her in this. I didn't pull her in this. You said that when you left [Rosalie's] house—you said that you went down to meet your mom. Your mom gave you some money, lent you some money. . . . And you wanted me a while ago not to involve your mom. Now if you stick with that story and you don't tell me why you did it, yeah, your mom's gonna be on the stand. Because you pulled her in it. I didn't. I didn't make up your mom's, uh, name. I didn't make up your mom's story. So if you want her to ride this roller coaster with you because all of a sudden you're afraid of, of—"

With regard to the comments about defendant's mother, we do not read Sergeant Johnson's remarks as "threatening" to involve her as a witness in the case unless defendant confessed. Rather, the officers, in essence, were telling defendant that by lying about having borrowed the money from his

mother, he himself was involving her in the case as a potential witness, which was an accurate observation. As the trial court observed in its lengthy ruling, "by virtue of [defendant's] representations . . . the mother was quite anticipatorily a witness who could be a witness who would be available, necessary to impeach that particular information or contradict that information. And of course, there's nothing that the Court can determine from that statement that is anything other than representation that that's not true and the mother is in a position to provide testimony that plans to meet the fact that—or any assertion that he received money from her was untrue. [¶] So the officers from time to time quite appropriately state as fact that because of comments he's made, representations of fact that Mr. McWhorter has made, as a result thereof he is bringing others into the picture, including his mother. And certainly they challenge him to . . . change that information or admit that it's inaccurate information. And there's nothing that the Court can determine that by virtue of those challenges and those statements that someone such as his mom could very well be a witness if that were the continuing presentation of fact by the defendant, certainly is not a threat or an aspect of coercion that the Court finds or feels or determines is of such a nature that it reaches the legal standard of a threat such that it would make the statement obtained at any point involuntary."

Defendant next claims the officers' comments about his brother, Troy McWhorter, were also improperly coercive. Again we must disagree. In directing the course of the casual conversation about defendant's brother, Sergeant Johnson was able to probe and learn more facts about whether defendant was being truthful in claiming his mother had lent him the money on September 11. For example, the officer asked defendant how Troy and his mother were doing, and then asked, "When's the last time you talked to her or seen her? Or Troy too?" Detective Wahl then asked defendant if Troy lived in Bakersfield, and when defendant answered yes, the detective followed up by asking, "And your mom lives in Bakersfield?" The officers thereby learned from defendant's next response that his mother lived in Tulare, not Bakersfield.

Defendant next suggests the officers lied to him by telling him someone had seen him near the Jordans' apartment on September 11 in order to coerce his confession. The record does not establish this was a lie. It is true that by the time of trial, two years after defendant furnished his statements, no such percipient witness was called to testify, but the reasons for that could be many. Defendant himself stated in his subsequent recantation to Detective Soliz eight days later that a pregnant young woman who lived across the way from the Jordans saw him leave their residence on September 11. Moreover, the defense had an opportunity to ask Sergeant Johnson who this witness was when he testified at the hearing on the motion to suppress the confession, but

he failed to do so. In any event, it is settled that deception alone does not necessarily invalidate a confession. (*People v. Thompson, supra,* 50 Cal.3d at p. 167.)

Finally, defendant points to those instances he deems "threats to involve [his] wife criminally," citing to portions of the first part of the statement where the detectives refer to Billie's possible involvement as an accessory after the fact.

As the trial court observed, defendant himself was the first one to bring up Billie when he stated, "You know, my wife's in another room [at the police station] scared to death I imagine." In response, Detective Wahl told defendant, "No, she's, she's fine. I, I talked to her. And she's fine. I mean, she's not happy about it but she's, she's fine."

Thereafter, defendant was confronted with the numerous lies he had been telling, including his lie to Billie that the $3,000 he gave her on September 11 had come from his mother. Sergeant Johnson told defendant they had given him the opportunity to tell the truth and he had not. The officers told him they believed he had killed Shirley and Joey because he was broke and needed money. Sergeant Johnson commented, "You said you wanted your family out of it. You wanted to save the—a few people a little heartache. Well, you're not, . . . you're dragging everybody within your family into this thing." Defendant continued to deny killing the Jordans, and Sergeant Johnson replied that he could prove it. At this point, Detective Wahl stated, "Well, I've—you know, another thing that bothers me, too, is, uh, I'm not convinced that Billie wasn't involved." Defendant replied, "Billie wasn't involved in anything 'cause nothing happened," to which Detective Wahl responded, "And, uh, you know, I—I haven't really decided yet if Billie's going to go with you too."

The questioning continued. Defendant stated to the officers, "Okay . . . let me tell you this. If, if you've got all this so-called evidence and witnesses, and you know I was gone for a couple of hours from [the Self/Amos residence], and you know for a fact Billie was there, then you know . . . good and well I'm not saying I did anything, and I didn't, but you know damned good and well she didn't, and couldn't have, and wasn't with me anywhere. So how can you sit there and say you're not sure." When defendant next stated, "[S]he doesn't have any knowledge," Sergeant Johnson replied, "Who took the money? Who took the blood money? Who's living in the van?" Detective Wahl added, "Mm-hmm. And who, who was lying about where they got the money yesterday and didn't say anything?" Defendant responded, "What's she supposed to do, jump up and call me a liar?"

Defendant again repeated that Billie was "scared to death" and asked the officers to "please let her go." At this point, defendant admitted he had lied when he said he borrowed money from his mother, and attempted to convince the officers Billie was not an accessory after the fact. Sergeant Johnson and Detective Wahl responded that they did not think Billie was involved in the actual murders, but again explained why she could be found an accessory after the fact given that she received the money, was living in the van purchased with the money, and had remained silent in the face of defendant's lies to the officers the previous evening about the source of the money used to buy the van.

Sergeant Johnson next told defendant, "The ball's in your court. You call the shots on, on what's gonna happen tonight . . . with Billie." Defendant responded, "I don't see why you can even think about arrestin' my wife for anything." Sergeant Johnson replied, "Because you're not bein' truthful." Defendant asked, "Because you want me to admit to murder?" Sergeant Johnson replied, "Cause I'm, I'm, no, I want you to tell me the truth. I'm gonna to [*sic*] charge you with murder. And I'm gonna convict you of murder."

Defendant next commented to Sergeant Johnson, "[F]or a nice guy to try to bulldog me into telling you something to, to get that little girl in trouble, that's pretty goddamn cold," to which Johnson replied, "You know, I'm not doing that. You're the one doing that." When defendant disagreed, the officer added, "because you're not being truthful." The exchange on the matter of whether Billie could be deemed an accessory after the fact continued, with Sergeant Johnson finally commenting, "[Y]ou may think I'm trying to pressure you by holding Billie over your head. I'm just being realistic. That's all, I'm being realistic." Defendant responded, "Well it sounds to me like you want me to admit to, admit to it so you'll let her go." Johnson replied, "No, you know what, you know what I want you to do? I want you to tell me the truth. And so far you haven't been telling me the truth. You've lied to me all this time here then all of a sudden at the end you say, you know what, she didn't know anything about that. Why should I believe that?" Defendant replied, "Because it's the truth."

Detective Wahl told defendant to consider that they already had enough evidence to get a warrant for his arrest for the murders. When Sergeant Johnson then asked, "And where'd you get the money when you left the house?," defendant responded, "Well I think that's gonna be between me and my lawyer but I damn sure, I damn sure didn't murder for it." The exchange continued. Defendant again stated, "[I]t's not fair that you're holding my wife over my head." Sergeant Johnson replied, "You know what, oh, I didn't put her up there. You did." Defendant disagreed, telling the officer, "You stood

there and told me if I don't tell you that I did this, that you're gonna hold her as an accessory." Sergeant Johnson responded, "And I told you, I told you that I wouldn't accept that unless you told me details. Did not, did I not? I'm not looking for you just to say okay I did it, let her go. I won't accept that. I will not accept that. And again, do not shift the blame on other people for something that you've done. I'm not over here because I'm a bad guy. I'm not over here because of me. I'm over here because of you. Billie's down here because of you. Eric's down here because of you. So don't try to reverse it."

At this point in the interrogation defendant admitted he had gone to the Jordan residence on September 11, claiming he and Shirley sat and talked for a while. He then stated that at some point he pulled out the knife Roesler had lent him and demanded money from Shirley. They struggled and he stabbed her, and then stabbed Joey. He admitted he "cleaned the knife up," returned to the Self/Amos residence, and gave the knife to Bob Amos.

After telling the officers he had killed the victims, defendant stated, "Now will you let my wife go please." Sergeant Jordan explained he would still have to talk to Billie, but then said "if what you're telling me is true" he would let Billie (and Roesler) go. The Sergeant then indicated he wanted defendant to "go back over this in a little bit more detail," to which defendant replied, "What do you want from me. I just want my wife out of here." Sergeant Johnson stated, "You haven't been able to share this with anybody and now is the time you can share it with me. And yes it's going to, it's going to benefit your wife. Because if you tell me (unintelligible)." Defendant asked, "I got your word she's gone, she gets to go?" Both Sergeant Johnson and Detective Wahl answered, "Yes." Defendant asked again, "[D]o I have your word?" Sergeant Johnson then made the comment on which the trial court based its determination to exclude the remainder of the statement as involuntary. He responded, "You have my word as a man to man that she goes if you give me enough details about the homicides that I can show . . . ." Defendant commented, "[The] details of what, I just told you what I did," to which Sergeant Johnson replied, "I know, I know. But I said I need specifics . . . ." The questioning continued, with defendant going over the events surrounding the murders and providing additional details.

Defendant argues these facts are analogous to those in *People v. Trout* (1960) 54 Cal.2d 576 [6 Cal.Rptr. 759, 354 P.2d 231] (*Trout*), overruled on another ground in *People v. Cahill* (1993) 5 Cal.4th 478, 510, footnote 17 [20 Cal.Rptr.2d 582, 853 P.2d 1037], in which the defendant's confession was found coerced and inadmissible. We disagree.

In *Trout*, the defendant was suspected of complicity in the kidnapping and armed robbery of an Oakland grocer and his wife. No woman was thought to

be involved when the incident came to the attention of the police. Eight armed officers entered the Trouts' residence late at night through an unlocked door with guns drawn. The Trouts' three young children were asleep in the bedrooms. The defendant and Mrs. Trout were separated and questioned, with Mrs. Trout saying she had been at church on the evening of the robbery. Sometime after midnight, the Trouts were taken in different automobiles to the Oakland police station. Mrs. Trout gave a written statement to the police at 3:00 a.m. The defendant was taken to a cell that had no sleeping facilities. Beginning at 10:00 a.m. the next morning he was interrogated four times, with Mrs. Trout present on two or three of the occasions as he was being questioned. Twice between interrogation periods Mrs. Trout was sent in to talk to the defendant. At 3:30 that afternoon, the defendant, in the presence of his wife, made an oral confession. Immediately following the confession, Mrs. Trout was released from custody. (*Trout, supra*, 54 Cal.2d at pp. 579–580.)

The defendant in *Trout* testified his confession was not true and that his knowledge of the details of the crimes had been obtained from newspaper accounts and from the police during the interrogation. The police led him to believe his wife would be retained in custody until he confessed, and the only reason he made the confession was to secure her release. While he was at home the police told him that his wife could remain there if he would give them a statement, and, when he answered that he could not confess because he did not know anything about the crimes, one of the officers, whose name he did not know, asked him what "manner of man" he was to allow her to go to jail when all he had to do was confess. (*Trout, supra*, 54 Cal.2d at p. 580.) Shortly after he arrived at the police station his wife was crying and tried to sit near him but was forbidden to do so. The interrogating officer told him Mrs. Trout should be at home with the children, that she could go home immediately if he confessed, and that all he had to do was " 'come clean and confess, clear this thing up, and she could go home with the children.' " (*Ibid.*) The first time the interrogating officer sent Mrs. Trout to talk to the defendant, she was crying and told him she had been informed she could go home if he confessed. At the second visit she said she had been taken home for a short while, that the baby cried for her when she left, and that she wanted to go home and " 'just couldn't bear it.' " (*Ibid.*)

According to the testimony of Mrs. Trout, the police told her when they first arrived at her home that she would not be arrested if her husband would tell them "what they wanted to know." (*Trout, supra*, 54 Cal.2d at p. 581.) At the police station, two officers told her they did not want her there, that she belonged at home with the children, and that she could go home if her husband told them all he knew about what happened. The interrogating officer also told her she would be released if her husband confessed to the crime, and that "when she would be released" depended entirely upon him.

After she had been taken home for a brief visit and had held her baby, she conveyed " 'that message' " to the defendant. (*Ibid.*)

This court found the Trouts' version of events truthful and compelling, and found the defendant's confession involuntary. (*Trout, supra,* 54 Cal.2d at pp. 583–585.) The facts of *Trout,* however, are plainly distinguishable from those now before us. Here, the investigating officers were not using the specter of hardship that would be wrought upon defendant's innocent wife or children to encourage him to confess, as was the case in *Trout.* Defendant knew Billie had not been taken into custody against her will, as was the defendant's wife in *Trout.* He was with Billie when she voluntarily agreed to go to the police station along with him to furnish her own statement after she was told she would then be free to leave, whereas defendant was being formally placed under arrest for the homicides regardless of the outcome of his own interrogation. Mrs. Trout was not herself suspected of any criminal activity in connection with the robbery kidnapping under investigation, whereas here, the officers had cause to suspect Billie's complicity in defendant's crimes as an accessory after the fact. Billie was living in a van that the officers suspected was purchased with stolen funds, and was likely aware defendant had lied, to her as well as other family members, about where he had obtained the $3,000. In short, Billie was not brought in to visit with defendant for the purpose of encouraging him to confess to the homicides, as was patently the case with Trout's wife, who was uninvolved in the crimes for which Trout was under investigation but who was nonetheless transported to the station house to talk with her husband while their young children remained at home.

In contrast to *Trout,* we find two Court of Appeal decisions—*People v. Jackson* (1971) 19 Cal.App.3d 95 [96 Cal.Rptr. 414] (*Jackson*) and *People v. Abbott* (1958) 156 Cal.App.2d 601 [319 P.2d 664] (*Abbott*)—much closer on point with the facts of this case.

In *Jackson, supra,* 19 Cal.App.3d 95, the victim was killed during an attempted burglary or robbery of his home where, according to information given the defendant, he kept a valuable coin collection. The defendant admitted firing the fatal shots when the victim resisted, but contended it was error to admit certain incriminating statements he made to police officers, claiming they were coerced. Defendant's wife had also been arrested in connection with the homicide at the same time as the defendant. Citing *Trout, supra,* 54 Cal.2d 576, the defendant argued his confession was involuntarily obtained under an implied promise by the police to release his wife in exchange for it. (*Jackson,* at p. 97.)

The record in *Jackson* showed that after the defendant and his wife were arrested, they were taken to the police station and placed in separate rooms

for interrogation. Officer Ross testified at the suppression hearing that the defendant asked, " 'What are you holding my wife for?' " to which he replied, " 'We don't know anything yet and we'll have to talk to you.' " (*Jackson, supra,* 19 Cal.App.3d at p. 98.) Then, when asked if he was waiving his rights, the defendant stated, " 'I'll give up the right to remain silent just to get my wife out of this, nothing more.' " (*Id.* at pp. 98–99.) Later, in response to further questions, the defendant stated, " 'I'll just give you what information I can to get my wife out of this. You know, as soon as possible, because she's got a heart condition and I don't want to put her through any more than I already have.' " (*Id.* at p. 99.) Officer Ross testified the subject of the defendant's wife " 'was brought up strictly by him,' " and he told the defendant that " 'after I got [*sic*] through talking to her and comparing what you told me with what she says, if I have reason to feel she's not involved in it, I'm sure as hell not going to book her.' " (*Ibid.*)

The *Jackson* court concluded, "Unlike *People* v. *Trout, supra,* 54 Cal.2d 576, 583–584, upon which defendant relies, there were no inducements nor, of course, were there any threats. At most there was a simple statement of fact by the officer that defendant's wife would be released if further investigation convinced him and his superiors that she had no connection with the crime despite the suspicious circumstances which defendant, by his own admissions, had created." (*Jackson, supra,* 19 Cal.App.3d at p. 100.)

The *Jackson* court observed that "the facts of this case are further distinguishable from *Trout* in that here there were reasonable grounds for the detention of defendant's wife, whereas in *Trout* no woman was involved in the crimes when their occurrence was originally brought to the attention of the police." (*Jackson, supra,* 19 Cal.App.3d at p. 100.) The court concluded, "Since the simultaneous arrests of defendant and his wife occurred before defendant's confession, and since they were both based on reasonable grounds the trial court properly held that there was no coercion or inducement within the meaning of the *Trout* decision." (*Ibid.*)

The *Jackson* court also relied on *Abbott, supra,* 156 Cal.App.2d 601. Finding the factual situation before it closely analogous to that in Abbott, the court explained, "There, as here, defendant's wife (albeit common law) was also taken into custody because she was living with defendant; there, as here, the officer told defendant that if the latter told the truth and there was no evidence to hold his wife, she would be released. The [*Abbott*] court observed that 'the officers made it clear to defendant that Miss Bell would not be prosecuted if their investigation failed to disclose evidence of her guilt, but this was not a threat to prosecute her if defendant did not confess the crime nor a promise to release her if he did. The fact, alone, that the principal motive for a confession is that it will probably result in the exoneration of

another person who is suspected of complicity in the offense does not render the confession involuntary.' (P. 605.) Likewise, as here, 'The officers believed that [defendant], and he alone, could implicate her or exonerate her. In justice to her it was their duty to learn, if they could, whether her further detention was warranted and this required the interrogation of [defendant]. If he felt himself under pressure to make a statement it came from the conditions he had created which placed Miss Bell under suspicion. If he made the statement willingly it was, in a legal sense, voluntary.' (P. 605.) The reasoning of the foregoing observations and statements controls here." (*Jackson, supra*, 19 Cal.App.3d at pp. 99–100.)

*Jackson* and *Abbott* support the trial court's determination that Detective Wahl's and Sergeant Johnson's comments to defendant about Billie's possible involvement as an accessory after the fact, and her possible role as a witness in defendant's case—up to the point where Sergeant Johnson remarked he would let her go if defendant gave further details about the murders—did not render the first part of the statement coerced or involuntary. This court's decision in *People v. Howard* (1988) 44 Cal.3d 375 [243 Cal.Rptr. 842, 749 P.2d 279] (*Howard*), is further instructive on the point.

In *Howard, supra*, 44 Cal.3d 375, a death penalty case, the defendant contended the police had used psychologically coercive techniques in questioning him, and had impliedly promised that his 16-year-old son, Gary, Jr., and the defendant's girlfriend, Joy Stevens, would not be charged in connection with the murder under investigation if he confessed. These " 'implied threats,' " the defendant alleged, " 'contain[ed] the corollary threat' " that if he did not talk, his son and girlfriend would be harmed by " ' "taking the fall" ' " for him. (*Id.* at p. 394.)

Shortly after his arrest, the defendant in *Howard* waived his *Miranda* rights, requested to speak with an officer, and furnished a taped statement. The defendant at first denied any involvement in the murder under investigation, claiming that on the morning of the murder he went with his son and girlfriend to visit relatives. (*Howard, supra*, 44 Cal.3d at p. 395.) Soon, however, he admitted having thrown the gun used in the murder into a lake, supposedly at the request of his girlfriend's stepfather, Richard Lemock. (*Id.* at p. 395.)

After going over the defendant's story, the interrogating officers informed him that his son, Gary, Jr., had shown the police where the defendant had parked in the vicinity of the murder. The defendant was told he was putting himself " 'on the point of calling your son a liar.' " (*Howard, supra*, 44 Cal.3d at p. 395.) One officer observed that Gary, Jr., was a 16-year-old boy worried about his father. The officer then stated that he knew Lemock was involved in

the murder and believed the defendant was as well. The officer stated he could not make any promises to the defendant, and suggested the defendant should "be guided by his own integrity and conscience 'to square your part of this thing away.' " (*Ibid.*)

During a break in the interrogation, the police interviewed the defendant's girlfriend, Joy Stevens, and Gary, Jr. When the interrogation recommenced, the defendant insisted neither his son nor girlfriend was involved. The officers described the information they had already obtained, commenting, " 'Joy gave it up. Gary Junior gave it up. Everybody is giving it up except Gary Senior.' " (*Howard, supra*, 44 Cal.3d at p. 396.) When the defendant expressed disbelief, the officers played portions of the taped statements of the defendant's son and girlfriend, at which point he was told, " '[T]here's a woman involved that you say you love. There's a kid you—you said before you loved.' " (*Ibid.*) Stevens could be heard crying on the tape as she recounted her story and answered questions. One officer then suggested the defendant was " 'letting [his] chick and son take [the] fall,' " adding, " 'I know you wouldn't want somebody else, especially someone you loved—ride [*sic*] a beef for you.' " (*Ibid.*) The officers told the defendant his son and girlfriend loved him, and that it had been hard for Gary, Jr., to tell the truth. (*Ibid.*)

The defendant then stated Lemock had offered him $1,500 to kill the victim. When one of the officers asked a question about something Gary, Jr., said, the defendant responded, " 'This isn't gonna involve him?' " (*Howard, supra*, 44 Cal.3d at p. 396.) The officers assured the defendant they did not " 'want' " his son or his girlfriend. (*Ibid.*) The defendant proceeded to admit further details of the crime, at one point asking if his girlfriend would be put in jail. The interrogating officer explained she had already gone home that evening, stating, " 'Hey I—I can't promise she never will [be wanted] . . . . But the other side of things, we let her go; but if we wanted her, Gary, we'd kept [*sic*] her.' " (*Id.* at p. 397.)

■ The defendant in *Howard* testified his motivation for talking with the police was to avoid trouble for his son and girlfriend. We explained, "when a reviewing court considers a claim that a confession has been improperly coerced, if the evidence conflicts, the version most favorable to the People must be relied upon if supported by the record. (*People* v. *Hogan, supra*, 31 Cal.3d at p. 835; *People* v. *Jiminez* (1978) 21 Cal.3d 595, 609 [147 Cal.Rptr. 172, 580 P.2d 672].)" (*Howard, supra*, 44 Cal.3d at p. 398.) " '[M]ere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary.' (*People* v. *Jiminez, supra*, 21 Cal.3d at p. 611.) In terms of assessing inducements assertedly offered to a suspect,

' "[when] the benefit pointed out by the police . . . is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made. [Citation.]' (*Id.* at pp. 611–612.) The police statements here constituted such permissible inducements." (*Howard*, at p. 398.) We distinguished *Trout, supra*, 54 Cal.2d 576, explaining that the defendant's son and girlfriend "were important witnesses and the police were fully justified in exploring the facts with them." (*Howard*, at pp. 398–399.)

Here, as in *Howard*, defendant's wife Billie was an important witness to various events that preceded and followed the murders. Moreover, she was herself being questioned as a possible accessory after the fact to defendant's crimes, based on evidence the officers had already gathered before interviewing defendant. We are further in agreement with the trial court's observation below that defendant was a "very mature individual, obviously, he interacted well in the discussion in the sense that his answers were responsive to questions made. He gave answers that were certainly reflective of his independence of suggestions made to him by officers. He was articulate in expressing himself. He showed substantial mental agility in interacting with the officers and in responding to various thrusts and efforts of the officers to, to in effect, catch him in what they perceived as untruths or lies. [He] did not appear to be fooled at any time by the nature of the questions or what the questions were calling for. He was responsive and at times, apparently, intentionally evasive when presented with questions that he had not the interest to respond to." The "mental level and intelligence" of the accused is a factor to be considered when assessing the voluntariness of incriminating statements. (*Jackson, supra*, 19 Cal.App.3d at p. 101, citing *People v. Sanchez* (1969) 70 Cal.2d 562, 571–572 [75 Cal.Rptr. 642, 451 P.2d 74].)

Having independently reviewed the totality of circumstances surrounding defendant's confession, we conclude the first part of the statement, up to the point where Sergeant Johnson made his express offer to let Billie go in exchange for additional details about the crimes, was freely and voluntarily given and properly ruled admissible.

## 2. *Attenuation of Second Statement (Recantation)*

Defendant sought to suppress his second statement in the same pretrial motion by which he sought suppression of his first statement. The motion, as it pertained to the second statement, was denied. He now contends the trial court erred when it found the second taped statement (including his recantation) fully admissible on the basis that it was sufficiently attenuated from that portion of his initial statement that was found involuntary. The argument is unavailing.

The precise question here is whether the retraction was the tainted product of the portion of defendant's first statement that the trial court excluded, which came *after* defendant had already confessed to the murders.

On October 12, 1995, eight days after defendant confessed to the murders, Kern County Sheriff's Detective John Soliz went to Las Vegas to reinterview defendant at the request of the district attorney who had charged the case. Detective Soliz had had no prior contacts with defendant. During this second interview, defendant recanted much of his earlier statement, now claiming he did not know how the Jordans were killed and asserting he made up the version of events he told to Detective Wahl and Sergeant Johnson "to keep my wife from going to jail." Defendant told Detective Soliz, "I was scared to death to even talk to them other officers[s] and then when they got me up here that night badgering me, I just made up that story."

Defendant went on to tell Detective Soliz his new and purportedly truthful version of events. He claimed that after leaving the Self/Amos residence on the morning of September 11, he realized his mother would not lend him any money so he went to the Jordan residence to ask Shirley for another loan. He and Shirley had coffee, he told her his truck had broken down, and he asked her for a $3,000 loan. Shirley entered her bedroom, closed the door, and returned with $3,000, which she gave to him. Defendant stated he did not tell Detective Wahl and Sergeant Johnson about this loan because he was scared, explaining, "I mean just, I don't know why. I'm an ex-con, scared to death. I mean a murder was committed." After Shirley lent him the money, they talked some more and Joey took his picture with a disposable camera. He left the Jordan residence at 1:30 or 2:00 p.m.

■ "Previous decisions have acknowledged that where—as a result of improper police conduct—an accused confesses, and subsequently makes another confession, it may be presumed the subsequent confession is the product of the first because of the psychological or practical disadvantages of having ' "let the cat out of the bag by confessing." ' (See *People* v. *Johnson* (1969) 70 Cal.2d 541, 547 [75 Cal.Rptr. 401, 450 P.2d 865]; *People* v. *Spencer* (1967) 66 Cal.2d 158, 167 [57 Cal.Rptr. 163, 424 P.2d 715].) Notwithstanding this presumption, 'no court has ever "gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." ' (*Spencer, supra*, 66 Cal.2d at p. 167, citing *United States* v. *Bayer* (1947) 331 U.S. 532, 540–541 [91 L.Ed. 1654, 67 S.Ct. 1394]; see *United States* v. *Toral* (9th Cir. 1976) 536 F.2d 893, 896; *United States* v. *Knight* (2d Cir. 1968) 395 F.2d 971.) Thus, the foregoing presumption is rebuttable, with the prosecution bearing the burden of establishing a break in the causative chain between the first confession and the subsequent confession.

(*Johnson, supra*, 70 Cal.2d at pp. 547–548; *In re Pablo C.* (1982) 129 Cal.App.3d 984, 990 [181 Cal.Rptr. 468].)

"A subsequent confession is not the tainted product of the first merely because, 'but for' the improper police conduct, the subsequent confession would not have been obtained. (*Johnson, supra*, 70 Cal.2d at p. 549.) As the United States Supreme Court has explained: '[N]ot . . . all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." ' (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 487–488 [9 L.Ed.2d 441, 83 S.Ct. 407]; *Johnson, supra*, 70 Cal.2d at p. 548.) The degree of attenuation that suffices to dissipate the taint 'requires at least an intervening independent act by the defendant or a third party' to break the causal chain in such a way that the second confession is not in fact obtained by exploitation of the illegality. (*People* v. *Sesslin* (1968) 68 Cal.2d 418, 428 [67 Cal.Rptr. 409, 439 P.2d 321]; see *People* v. *Rich* (1988) 45 Cal.3d 1036, 1081 [248 Cal.Rptr. 510, 755 P.2d 960].)" (*People v. Sims* (1993) 5 Cal.4th 405, 444–445 [20 Cal.Rptr.2d 537, 853 P.2d 992].)

 Here, of course, defendant's second statement was a recantation, not a second confession, but for purposes of determining its voluntariness we find the same principles of attenuation apply.[13] We agree with the trial court's determination that the second taped statement was sufficiently attenuated from that portion of defendant's first statement that was found involuntary and excludable (which portion itself came *after* defendant had already confessed to the murders). The sufficient indices of attenuation include: (1) defendant was properly Mirandized at the start of the second interview, as he acknowledges; (2) more than a week transpired between the first and second interviews;[14] (3) the second interview was conducted, not by the same officers who had conducted the first interview, but by Detective Soliz, who had had no prior contacts with defendant and had not reviewed the tape of the

[13] In likelihood defendant sought to suppress his second statement because, after recanting his confession of one week earlier, he then furnished Detective Soliz with an assertedly truthful accounting of events that placed him in Shirley and Joey's apartment on the afternoon of September 11, the critical date and time in question.

[14] Compare *Lyons v. Oklahoma* (1944) 322 U.S. 596, 604 [88 L.Ed. 1481, 64 S.Ct. 1208], in which a 12-hour interval between an involuntary confession obtained by physical beating and psychological coercion and a subsequent confession constituted sufficient attenuation, and *U.S. v. Patterson* (9th Cir. 1987) 812 F.2d 1188, 1189–1190, in which a three-hour interval between an involuntary confession obtained by a brutal beating and a subsequent confession constituted sufficient attenuation.

first interview before he conducted the second interview; (4) Detective Soliz made no attempt to exploit any information obtained in the first statement, the latter portion of which was later determined to be involuntary. Indeed, when asked by defendant about charges relating to Billie, Detective Soliz told him that, to his knowledge, she was not going to be charged; (5) as the trial court found, defendant's "maturity and ability to again handle himself in a fashion that reflects maturity and sophistication and articulation" served to cleanse any taint; and (6) defendant's second statement was furnished in an effort to recant his earlier confession, a circumstance we find weighs in favor of a finding that he gave it freely and voluntarily.

### 3. *Exclusion of Defense Expert Gregory Haussmann's Testimony*

One defense theory presented below was that Shirley and Joey Jordan died accidentally of carbon monoxide poisoning. Dr. Michael Baden, a forensic pathologist and private defense consultant in this case, testified that the most common cause of multiple deaths, where there is no other obvious cause, is carbon monoxide poisoning. Based on his examination of the photographs of the crime scene and Dr. Walker's autopsy report, Dr. Baden concluded both deaths were the result of asphyxia caused by carbon monoxide poisoning.

Billie McWhorter was also called by the defense in support of this defense theory. She testified that when she and defendant moved out of the apartment next to the Jordans, defendant moved a washing machine into a water heater shed adjacent to the Jordans' unit. Billie further recalled that defendant "bumped" a natural gas valve leading to the water heater, which caused a momentary gas leak until he could shut the valve off and tighten it, "and then it was okay." Additionally, the jury saw photographs (including a conventionally enlarged photograph) showing that the bathroom window between the residence and the shed was slightly open.

Prior to trial, the defense disclosed to the prosecution a report in which Gregory Haussmann, an engineer with Failure Analysis Associates, a forensic engineering consulting firm in Menlo Park, set forth his conclusion "that a lethal concentration of carbon monoxide could have been produced by a water heater attached to the deceased[s'] residence, could have entered the dwelling residence through a 'partially opened' window and may have caused the death of two persons therein." The prosecutor filed a pretrial motion to exclude the anticipated testimony on grounds it was based on speculation and conjecture, was unsupported by evidence that could reasonably be relied on by the expert, and was more prejudicial than probative under Evidence Code section 352.

An evidentiary hearing was conducted pursuant to Evidence Code section 402 to determine whether a proper foundation for Haussmann's expert opinion testimony could be laid pursuant to Evidence Code section 801.[15] Haussmann testified at the hearing. At its conclusion, the trial court ruled Haussmann's expert opinion testimony inadmissible. Defendant contends the ruling was an abuse of discretion. We disagree.

"[T]he value of an expert's opinion depends on the truth of the facts assumed." (1 Witkin, Cal. Evidence (4th ed. 2000) Opinion Evidence, § 28, p. 558.) "Where the basis of the opinion is unreliable hearsay, the courts will reject it." (*Id.*, Unreliable Hearsay, § 36, p. 567; see, e.g., *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 43–44 [69 Cal.Rptr. 561, 442 P.2d 641] [rejection of expert opinion testimony based on unreliable hearsay not an abuse of discretion].) It is settled that a trial court has wide discretion to exclude expert testimony, including hearsay testimony, that is unreliable. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1061 [90 Cal.Rptr.2d 607, 988 P.2d 531]; *People v. McDonald* (1984) 37 Cal.3d 351, 373 [208 Cal.Rptr. 236, 690 P.2d 709].)

We conclude the trial court did not abuse its discretion in ruling Haussmann's testimony inadmissible on grounds that it was unduly speculative, based on unreliable hearsay, and without an adequate foundation.

First, Haussmann's conclusion—that it was possible an "exhaust vent" on top of the water heater had become dislodged several inches when defendant installed the washing machine in the shed adjacent to the Jordans' unit, thereby causing a fatal carbon monoxide leak—was based solely on a defense investigator's hearsay report recounting an interview with Billie McWhorter. Because neither the defense investigator nor Billie was called to testify and authenticate the report at the hearing, it remained unsubstantiated hearsay.[16]

---

[15] Evidence Code section 801 provides, in relevant part, "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] . . . [¶] (b) Based on matter . . . perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ."

[16] The court made its pretrial ruling without prejudice, indicating it would entertain a defense request to reconsider its ruling based on evidence introduced at trial. Defendant never renewed his request to call Haussmann as a witness after Billie testified for the defense that defendant installed a washing machine in the shed, causing a momentary natural gas leak, which he fixed. Indeed, the information in the defense investigator's report was later *contradicted* by Billie's actual trial testimony. For example, the report indicated Billie had stated that defendant, on two or three occasions while he was installing the washing machine in the shed, "jump[ed] over the washer and ran to the alley to turn off the gas." Billie testified at trial that she was standing outside the shed while defendant was installing the washing machine, suggesting she did not actually witness the events occurring inside the shed.

Second, hearsay problems aside, the report could not have served as a sufficiently reliable source of information on which Haussmann could base his expert opinion. Haussmann testified his opinion hinged on whether the water heater's "exhaust vent" had become dislodged. But he conceded at the foundational hearing he had no proof the vent had actually become dislodged, and indicated he would base the entirety of his testimony on inferences to be drawn from the defense investigator's report of the gas valve bumping incident recounted by Billie. The investigator's report, however, made no specific mention of the water heater's exhaust vent, much less that it had become dislodged.

Third, the record reflects that a new or different water heater was installed in the Jordans' unit at some point in the ensuing two years between the Jordans' deaths and defendant's trial. The actual water heater and exhaust vent that Haussmann speculated had caused a carbon monoxide leak that killed the Jordans was no longer available for his or anyone else's inspection by the time of trial. Haussmann speculated at the hearing that the replaced water heater must have been old, and thus more susceptible to having its exhaust vent become dislodged. But no facts were known about the model, age, size, or condition of the water heater installed in the shed at the time of Shirley's and Joey's deaths in September 1995.

Nor is there any merit to defendant's claim that this asserted error is of constitutional dimension because it violated his Sixth Amendment right to present a defense. The defense theory that the victims may have died from carbon monoxide poisoning, weak though it was, was presented to the jury through the testimony of Billie McWhorter, who testified defendant installed the washing machine in the shed before moving out, and "bumped" a natural gas valve in the process; through photographic evidence of the bathroom window between the residence and through the adjacent shed, depicting the window slightly open or ajar; and the testimony of defense expert Dr. Baden, a forensic pathologist who furnished his opinion that the Jordans likely died of asphyxia from carbon monoxide poisoning. Although Haussmann's expert opinion—that a *dislodged water heater exhaust vent* could have caused the release of carbon monoxide fumes and the fatal poisoning of the Jordans— was properly excluded as speculative and lacking adequate foundation,

---

Moreover, at trial she testified defendant "bumped" a gas valve while moving the washing machine, which caused a momentary natural gas leak until he could shut the valve and tighten it, "and then it was okay." The investigator's report, in contrast, noted Billie had said defendant "somehow moved the water heater which caused the gas to leak." In short, although the defense called Billie as a witness at trial on the point, her testimony ultimately did not furnish a factual basis for Haussmann's expert opinion that *if* the water heater had been moved, such movement likely caused its exhaust vent to become dislodged, thereby likely causing carbon monoxide fumes (as opposed to natural gas) to enter the victims' apartment more than a week later, proving fatal to the Jordans.

defendant was not otherwise precluded from presenting this defense through admissible testimony and evidence.[17]

### 4. *Exclusion of Defense Expert Norman Perle's Testimony*

Defendant next claims the trial court abused its discretion when it ruled that the foundational requirements for admission of the opinion testimony of Norman Perle, defendant's forensic image-enhancement expert, had not been met, and excluded Perle's testimony. We find no abuse of discretion.

In support of the defense theory that the Jordans died of carbon monoxide poisoning, the defense relied on photographs of the bathroom window between the residence and its adjacent water heater shed depicting the window slightly open or ajar.

Prior to trial, the prosecution moved to exclude the proffered opinion testimony of defense expert Norman Perle, an expert in the field of electronic processing of visual and audio recorded data. The motion sought to exclude a "forensic image enhancement" Perle had created from a picture of the bathroom window furnished by the prosecution as discovery, as well as his expert opinion testimony regarding the image he created. The defense desired to introduce the enhanced image, and Perle's testimony explaining it, for the purpose of assisting the jury in seeing that the window was indeed slightly open or ajar.

█ The prosecutor argued in opposition to the motion that the enhanced image and Perle's opinion testimony were inadmissible unless a proper foundation could be laid for the image-enhancing technique he used pursuant to *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] (*Kelly*) (see also *Frye v. U.S.* (D.C. Cir. 1923) 293 F. 1013). Under the *Kelly* standard, evidence based upon application of a new scientific technique may be admitted only after the reliability of the method has been foundationally established, usually by the testimony of an expert witness who first has been properly qualified. The proponent of the evidence must also demonstrate that correct scientific procedures were used (*Kelly, supra*, 17 Cal.3d at p. 30), and that the scientific technique concerning which the evidence is being offered has gained general acceptance in the particular field to which it belongs.

---

[17] It is noteworthy that nothing in the foundation proffered for Haussmann's opinion testimony, and nothing in Dr. Baden's trial testimony proffered in support of the carbon monoxide asphyxia defense, served to explain why deadly carbon monoxide fumes would not have escaped into the Jordans' apartment during the one-week period between the time defendant installed the washing machine in the shed before moving away on September 4, 1995, and the earliest date on which Shirley and Joey could have died, September 11, 1995.

(*People v. Leahy* (1994) 8 Cal.4th 587, 594 [34 Cal.Rptr.2d 663, 882 P.2d 321] (*Leahy*); *People v. Wash* (1993) 6 Cal.4th 215, 242 [24 Cal.Rptr.2d 421, 861 P.2d 1107].)

The prosecutor argued further that the enhanced image and Perle's expert opinion testimony were unnecessary because the jurors could look at the conventional photographs themselves and determine whether or not the window was open, and that the enhanced image should be excluded as more prejudicial than probative under Evidence Code section 352.

In his written opposition to the motion, defendant argued that reasonable jurors could differ in their perception of whether the window was open or closed when viewing the conventional photograph, although defense counsel himself stated plainly, "The window appears partially open to me." It was further argued that "[t]he methods used to enhance the image," referred to as "electronic embossing," "employ products generally available to the public which are produced by software companies listed on the national security exchanges." However, the actual software program utilized by Perle to create the enhanced image was not identified. The defense took the position that "[e]lectronic image and sound processing is a field which has thoroughly established its presence and general reliability in our 1997 society"; that the *Kelly* foundational requirements "rightfully require a foundational showing in situations where there is a conceptually new procedure or technology," but that "[t]he questions involved here are qualitatively different from those issues." The opposition to the motion to exclude Perle's testimony concluded that "[a]n Evidence Code Section 402 hearing is inappropriate and would be a waste of court time."

A lengthy foundational hearing was conducted on the matter at which Perle, and prosecution expert Jim Ray, who was employed by the Kern County District Attorney's Office as an evidence technician in charge of digital imaging and video/audio services, each testified. Perle was the owner and director of the National Audio Video Forensic Laboratory; had worked with various aspects of recorded evidence, both audio and video; and had provided services related to recorded evidence such as enhancements, authenticity analysis, imaging for detail and identification, voice identification, and other forensic media services. He was certified by an organization known as the American Board of Recorded Evidence and was a member of the American College of Forensic Examiners.

Perle's credentials notwithstanding, it will suffice to observe that he could not identify the computer program he used to enhance or "electronically emboss" the image in question, nor could he satisfactorily explain the full nature of the process he used to create it.

When the prosecutor, in cross-examining Perle, observed that the photographic image from which he created his enhanced image was in color, whereas the enhanced image was in black and white, Perle could not recall whether he converted the image from color to black and white. Nor could Perle recall whether he had increased or decreased the contrast of the image. When asked on cross-examination how the "embossing" feature of the unidentified software program he used works, Perle answered, "Really carefully. I don't know exactly what the algorithms are or how to explain this to you, but you can take a two dimensional process image and you can emboss or deboss, which means you can make the surface of what you're viewing appear to have greater detail or you can have the background appear to have greater detail. That would be debossing. And the emboss process is one that's called into play to give a viewer a different perspective, one that would, one that would have a perception of depth. That is the best I can explain this."

As noted, in his written opposition to the motion, defense counsel had taken the position that a *Kelly* foundational hearing would be "inappropriate" and "a waste of court time." Now, upon commencing his argument at the conclusion of testimony at the hearing, defense counsel appeared to switch horses, acknowledging the prosecution's objection to Perle's testimony on *Kelly* grounds, and further acknowledging that "reliability and acceptance of procedure is relevant in any scientifically based opinion, expert opinion."

As the arguments continued, however, defense counsel made a number of noteworthy concessions. He agreed Perle had not adequately described how the "embossing process" he used works. In response to the court's comment that it "never could quite figure out what he accomplished, particularly with the embossing and sharpening aspect of the process he described," defense counsel responded, "I recognize in the description by Mr. Perle of the exact mechanisms by which these programs accomplish that which they do that I was not able to find a clear statement, myself, of the mechanism by which these computer programs actually perform the task which they are ascribed to have done." Acknowledging further that Perle did not know what imaging software he had used in this case or precisely how it worked, defense counsel added, "He doesn't know the exact mechanical process by which the computer does that which it does. That's something that is outside of his field of expertise."

At one point defense counsel tried to salvage Perle's testimony by seemingly abandoning his argument that the testimony satisfied the Kelly foundational requirements and arguing instead that Perle's process was a "tool." Counsel suggested that although Perle might not know how the program did

what it did, "he is an expert in the use of these tools and is an expert in the interpretation of the images and the products that these tools provide."[18]

Finally, when the court asked defense counsel whether he agreed that the enhanced image showed something that was not apparent in the original image, counsel disagreed, observing that the enlarged photograph made by conventional photographic means also showed the window to be slightly open. He added, "[Y]ou know, honestly, Judge, if I, if I see a weakness in the admissibility of this evidence, opinion of Mr. Perle, it's that maybe it's not necessary because of the [conventional] photographic enlargement shows the same thing that Mr. Perle's enhanced image via the video disc shows."

█ As we earlier observed, *Kelly* requires as a foundational matter that the reliability of a new scientific technique be established by a properly qualified expert. Such expert's qualifications are subject to review for abuse of discretion. (*People v. Ashmus* (1991) 54 Cal.3d 932, 971 [2 Cal.Rptr.2d 112, 820 P.2d 214].) We conclude on this record that the trial court did not abuse its discretion in excluding Perle's expert opinion testimony. Assuming for sake of argument that the ruling was error, it was clearly harmless given that defense counsel, and Perle himself, conceded the conventional photographic image and Perle's enhanced or embossed image showed the same thing—that the window was slightly open.[19]

### 5. *Exclusion of Third Party Culpability Evidence*

Defendant argues the trial court erroneously precluded him from introducing evidence that a third party, Glenn Jordan, one of Shirley's ex-husbands and Joey's father, committed the murders. The claim must be rejected.

█ "We repeatedly have indicated that, to be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt, must link the third person either directly or circumstantially to the actual perpetration of the crime. In assessing an offer of proof relating to such evidence, the court must decide

---

[18] The mere fact that a person is familiar with how to use a scientific test or procedure does not qualify him or her to establish general acceptance in the scientific community of, or relate the scientific bases underlying, the test or procedure. (*Leahy, supra,* 8 Cal.4th at pp. 608–609.)

[19] Defendant also argues the Court of Appeal in *People v. Williams* (1996) 46 Cal.App.4th 1767 [54 Cal.Rptr.2d 521], found a digitally enhanced image met the *Kelly* foundational requirements, and that the trial court below was bound to follow that decision. (See *Leahy, supra,* 8 Cal.4th at p. 595.) We disagree. *Williams* involved an enhancement process known as "segmentation," which involved "mapping" an image through a mathematical formula to create a more discernable image. (*Williams, supra,* 46 Cal.App.4th at pp. 1777–1778.) That does not appear to be the same as the "embossing" process utilized by Perle, and even if it were, his testimony at the foundational hearing fell far short of establishing the same.

whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352. (See *People v. Davis* [(1995)] 10 Cal.4th 463, 501 [41 Cal.Rptr.2d 826, 896 P.2d 119]; *People v. Cudjo* (1993) 6 Cal.4th 585, 609 [25 Cal.Rptr.2d 390, 863 P.2d 635]; *People v. Alcala* (1992) 4 Cal.4th 742, 792–793 [15 Cal.Rptr.2d 432, 842 P.2d 1192]; *People v. Kaurish* (1990) 52 Cal.3d 648, 685 [276 Cal.Rptr. 788, 802 P.2d 278]; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1017–1018 [254 Cal.Rptr. 586, 766 P.2d 1].)" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325 [65 Cal.Rptr.2d 145, 939 P.2d 259].)

In *People v. Hall* (1986) 41 Cal.3d 826 [226 Cal.Rptr. 112, 718 P.2d 99], we held that "the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt." (*Id.* at p. 833.) "Our holding [in *Hall*] did not, however, require the indiscriminate admission of any evidence offered to prove third-party culpability. The evidence must meet minimum standards of relevance: 'evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' (*Hall, supra*, 41 Cal.3d at p. 833.) We also reaffirmed that such evidence is subject to exclusion under Evidence Code section 352. [Citation.]" (*People v. Edelbacher, supra*, 47 Cal.3d 983, 1017.)

Prior to trial, the prosecution filed a motion to exclude evidence of third party culpability. The prosecutor indicated in the motion that he had been provided with discovery by the defense relating to third party culpability consisting of a taped conversation between defendant's trial counsel, a defense investigator, and witness Cynthia Durham, a friend and former neighbor of Shirley Jordan, as well as documents reflecting that in 1994 and again in 1996, Glenn Jordan, one of Shirley's ex-husbands and the father of Joey Jordan, had been convicted of misdemeanor infliction of corporal injury upon a spouse or cohabitant (§ 273.5, subd. (a)). In the taped interview, Durham stated that in January of 1995, eight months before the murders, Shirley saw Glenn Jordan parked outside the apartment complex where she was then living (prior to moving to the Wilson Avenue apartment in which she and Joey were killed). During the interview Durham also told the defense investigator, with some measure of prompting according to the prosecutor, that when Shirley saw her ex-husband parked outside her home she got a "panic stricken look on her face."

The prosecutor argued in support of his motion that the information presented was too speculative to be admissible, and further, that it was excludable under Evidence Code section 352 as more prejudicial than probative.

Defense counsel filed an opposition to the prosecutor's motion. He reported that according to published accounts of the murders (supposedly based on information furnished by the police investigating the case), the Jordans' bodies were discovered on September 18, 1995; that their deaths were thought to have occurred three to five days earlier; and that defendant had been in Las Vegas during this timeframe. The opposition indicated further that one week after the murders, Chris Barton, Joey's 13-year-old friend, reported to detectives she had heard a television set in the Jordans' residence on the afternoon of September 12 when she went to look for Joey; that she did not hear the television when she returned a few days later; and that she knew Joey was afraid of his father, Glenn Jordan, and feared he "would come back and beat him up."

Defense counsel went on to relate in the opposition to the motion that Cynthia Durham had told him that in January 1995 (eight months before the murders), Shirley told her she was afraid of her ex-husband, who had parked in front of her former residence on Wilson Avenue and stared through the window for several minutes. Counsel reported that Durham told him Shirley was "panic stricken" as a result of this incident, and further, that Shirley's car had been parked in front of the apartment complex at the time.

The opposition to the motion next reported that, according to police reports, in June 1994 (16 months prior to the murders), Glenn Jordan had struck Emily McCoy, his "common law wife," in the head, "forcing her face to strike a wall," and had again struck McCoy on April 24, 1996 (eight months after the murders), "causing her to strike the back of her head on an object, causing a gash." As a result of each incident, Glenn Jordan pleaded guilty to one misdemeanor count of inflicting corporal injury on a spouse or cohabitant. Defense counsel pointed out that the murder investigation had revealed a dent in a wall in the Jordans' kitchen, which he stated "the People assert was caused by the head of Shirley Jordan."

The opposition next reported that a series of phone calls had been made by Emily McCoy—one to another of Shirley's ex-husbands, Lewis Smith;[20] another to a former wife of Glenn Jordan's, Mary Frye, shortly after the murders. Frye allegedly confirmed for McCoy that Glenn Jordan had beaten her during their marriage; told her Shirley was afraid of Glenn; and told her Shirley would not let Frye's daughter Jennifer see Joey if Jennifer disclosed to Glenn the location or phone number of Shirley and Joey. The opposition also related that McCoy had told defense counsel that Frye had told her that daughter Jennifer had "stated that she had never seen her father Glenn, with

[20] Although the opposition stated McCoy called Smith to learn if Glenn had been "abusive" to Smith and Shirley's children (Shirley apparently had children from her marriage with Smith), the opposition did not report how Smith responded to McCoy's inquiry.

anything other than cowboy boots on his feet." Defense counsel pointed out that prosecution Criminalist Laskowski had identified a shoe print or impression on the carpet near Shirley's body "as a cowboy boot print."

Defense counsel also reported in his opposition to the motion that Glenn Jordan had called the sheriff's department the day after the murders to state he did not kill his ex-wife and son, telling police the last time he had seen Joey was on a chance meeting at a bank in 1992. Counsel indicated he believed Glenn Jordan's source of income was from Supplemental Security Income (SSI), and that the Kern County District Attorney's Office deducted child support payments from Glenn's SSI payments for Joey.

Defense counsel then summarized the defense theory of third party culpability in the opposition as follows: "Investigation is continuing. However, at this time, there is corroborated evidence of propensity for violence against [Glenn's] wives and children over an extended period of time before and after the discovery of decedents. There is an on going and immediately recent expression of fear of Glenn by decedents Shirley Jordan and Joseph Jordan. There is an act of apparent stalking of Shirley where Glenn observes the car in front of the apartment. There is motive in the ongoing child support payments. There is circumstantial evidence of his commission of the offense by the dent in the wall showing identity of modus operandi and the cowboy boot print next to the body. Richard McWhorter was not wearing cowboy boots on September 11, 1995."

At the hearing on the motion to exclude the defense evidence, defense counsel added that Shirley's close friend Angelica Herrera was also claiming that after moving from 1319 Wilson Avenue to 1016 Wilson Avenue, Shirley "increased her vigilance" and "acted as though she was regularly in fear of someone or something." The trial court observed that neither the written nor oral offers of proof tendered by defense counsel were in the form of reliable sworn declarations. The prosecutor stated he would accept defense counsel's offer of proof (although not the validity of the facts averred) "[f]or expediency [sic] sake." Defense counsel proceeded to argue that the prosecutor's motion to exclude the defense evidence of third party culpability should be denied, outlining the anticipated evidence he had reported in his opposition to the motion.

The prosecutor in turn argued that the evidence of Glenn Jordan's misdemeanor convictions of inflicting corporal injury on a spouse or cohabitant would not be admissible to show modus operandi because the defense suggestion that Glenn's abuse of his current wife was consistent with the murder of Shirley Jordan was "a huge stretch." He further represented to the court that the defense investigator had told him Emily McCoy was never

interviewed by the defense because "they haven't found [her]," and argued the information about the incidents, to the extent gleaned from police reports, was inadmissible hearsay that should not be admissible at trial.

The prosecutor also argued that the opinions of friends or neighbors, to the extent they claimed to know or had observed Shirley to be fearful of someone or something (i.e., Angelica Herrera's claim), did not establish that Shirley specifically feared her ex-husband Glenn. He argued the evidence of the dent in the kitchen wall and the shoe print or impression on the carpet near Shirley's body was inconclusive, noting it "seem[ed] rather ironic" defense counsel would include it because questions had been raised in the case (presumably by the defense) about whether prosecution Criminalist Laskowski should even be permitted to furnish an opinion about the source of the print.[21] The prosecutor stated that although defense counsel may have felt he knew the actual source of the print (counsel had stated in the opposition that Glenn Jordan "always" wore cowboy boots, and that defendant was not wearing cowboy boots on Sept. 11), he did not believe that had been resolved "as a matter of fact" in the case.

The prosecutor argued counsel's suggestion that Glenn was "stalking" Shirley by parking in front of her former residence eight months prior to the murders was "purely speculation on the defense part," suggesting it was just as possible Glenn might have parked there simply to get a glimpse of his son whom he had not seen or perhaps was not allowed to see. He further argued the suggestion that Glenn could locate Shirley's new residence by searching for her car, or type of car, on the streets of the neighborhood was at best a speculative inference.

The prosecutor also represented he had received no discovery from the defense concerning whether Shirley was receiving child support payments from Glenn Jordan directly through the district attorney's office, stating, "I don't know that that is a fact." He surmised that if such payments had been ordered they would likely have been ongoing for some time, and found it "rather extreme" for the defense to infer that the desire to avoid those payments would suddenly become a motive for murdering Shirley and Joey. He argued, "Who knows. Maybe [Glenn Jordan] felt it was the right thing that he was giving support to his son. I don't know. Defense doesn't know."

The prosecutor concluded by summarizing his position on the defense offer of proof as follows: "What we're left with, as I said before, is a person who's

---

[21] Laskowski initially felt the print or impression could possibly have been made by a cowboy boot. At trial, he testified the impression was caused by a smooth-soled shoe or boot, and could possibly have been made by a large limb like a thigh or a knee. Defendant's own blood spatter expert concluded the impression had been caused by the movement of an appendage.

afraid of this third party, which is not enough under *Hall*. Additional to which you have very, very attenuated potential motive to end the payments, I guess. And the possibility, although I think evidentiary-wise it's never coming in, the possibility that he was violent towards another woman. That's just simply not enough under *Hall*."

The court proceeded to rule on and grant the prosecutor's motion to exclude the third party culpability evidence. It found the possible motive of ending child support payments by killing one's former wife and son "very attenuated." It found the proffered evidence "that Mr. Jordan is a habitual wearer of cowboy boots" insufficiently probative of identity without further evidence of a brand or size of boot that "in a logical chain" would link the print impression found at the crime scene to Glenn Jordan. It found the defense theory regarding the proffered evidence of Glenn's past or future acts of violence against women to be largely propensity evidence that, without more, would not likely be admissible in a trial for murder according to the rules of evidence.

We conclude the record supports the trial court's ruling. The motive defense counsel ascribed to Glenn Jordan for the murders—that of killing one's former wife and son in order to end child support payments—was entirely speculative. So too was the attempt to establish identity by linking him to the crime scene based on hearsay evidence that his daughter had "never seen her father Glenn, with anything other than cowboy boots on his feet"; defense counsel's own personal attestation that "Richard McWhorter was not wearing cowboy boots on September 11, 1995"; and counsel's further suggestion that Glenn Jordan's "modus operandi" was to beat his wives in a manner resulting in their heads banging against walls and leaving dents in those walls.

 We agree with the trial court that much of defendant's offer of proof consisted of mere evidence of a propensity for violence to prove identity that would not have been admissible in a trial for murder or, even if it was, would not itself have established identity. As we explained in *People v. Davis, supra,* 10 Cal.4th 463: "*Hall* did not abrogate Evidence Code section 1101 as applied to such evidence. Subsequently, in *People v. Farmer* (1989) 47 Cal.3d 888 [254 Cal.Rptr. 508, 765 P.2d 940], we specifically addressed the application of Evidence Code section 1101 to proposed evidence regarding prior criminal conduct of a third party alleged to have committed the charged offense. The defendant in *Farmer* offered evidence of a third party's history of violent crime, on the theory that it tended to identify him as the perpetrator. We noted that under *Hall*, evidence linking a third person to the actual perpetration of the crime should be treated like any other evidence. (*Id.* at p. 921.) We went on to hold, however, that the proffered evidence was

properly excluded under Evidence Code section 1101, because it was offered not to show a fact other than the third party's criminal disposition, such as motive or intent, but merely to show that the third party was the more likely perpetrator because he had a history of violence. (47 Cal.3d at p. 921.) Such evidence does not amount to direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Davis, supra,* 10 Cal.4th at p. 501.)

### 6. Trial Court's Neutrality

Defendant next claims the trial court "failed to maintain an atmosphere of neutrality" and was unduly harsh to his trial counsel, undermining his right to an unbiased jury and prejudicing his guilt and penalty verdicts. The claim is unavailing.

"Although the trial court has both the duty and the discretion to control the conduct of the trial (*People v. Fudge* [(1994)] 7 Cal.4th [1075,] 1108 [31 Cal.Rptr.2d 321, 875 P.2d 36]), the court 'commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression it is allying itself with the prosecution' (*People v. Carpenter* (1997) 15 Cal.4th 312, 353 [63 Cal.Rptr.2d 1, 935 P.2d 708]). Nevertheless, '[i]t is well within [a trial court's] discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or otherwise engages in improper or delaying behavior.' (*United States v. Donato* (D.C. Cir. 1996) [321 U.S. App.D.C. 287] [99 F.3d 426, 434].) Indeed, '[o]ur role . . . is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.' (*United States v. Pisani* (2d Cir. 1985) 773 F.2d 397, 402.)" (*People v. Snow* (2003) 30 Cal.4th 43, 78 [132 Cal.Rptr.2d 271, 65 P.3d 749] (*Snow*).)

First, because defendant raised no objection below on the grounds asserted in this claim, and did not seek a jury admonition regarding any of the alleged instances of judicial intemperance, he has failed to preserve the issue for appellate review. (*Snow, supra,* 30 Cal.4th at p. 78; *People v. Boyette* (2002) 29 Cal.4th 381, 459 [127 Cal.Rptr.2d 544, 58 P.3d 391]; *People v. Fudge, supra,* 7 Cal.4th 1075, 1108.)

Even if the issue were properly before us, we would find no judicial misconduct. Defendant points to various comments by the trial judge during voir dire that, he asserts, "prevented defense counsel from exploring areas with potential jurors that could lead to challenges for cause," and did so "in

ways that attacked the integrity of counsel and painted him as someone willing to bend the rules in order to achieve his ends." We have reviewed each comment or remark in the record of which defendant complains, and are satisfied there was no error, much less error rising to the level of judicial misconduct. In many instances the trial judge simply used the word "unfair" somewhat indiscriminately when suggesting, for example, that counsel had posed an "unfair" hypothetical to a prospective juror. In those instances, the court's remarks could not in reason have been understood as disparaging defense counsel for being "unfair" to anyone; rather, the court appears to have used the term broadly to refer to inartfully worded inquiries to the jurors.

In one instance, defendant claims the court prevented counsel from probing a prospective juror (Mr. F.) about his views on the death penalty. We have reviewed the complained-of passage and find the court was merely clarifying several of counsel's questions put to the prospective juror, and in no way sought to preclude counsel from conducting a thorough voir dire. In other instances, despite defendant's assertion here that comments by the court had disparaged counsel in the eyes of the jurors, counsel ultimately thanked the court for its guidance, or conceded that the question perturbing the court was indeed confusing or unclear.

Defendant also claims the court's bias against the defense in general was apparent from the fact that it ruled against him on several of the pretrial issues discussed above, including the exclusion of the proffered opinion testimony of defense experts Gregory Haussmann and Norman Perle, and the exclusion of third party culpability evidence concerning Glenn Jordan. Since we have in each instance found the proffered testimony or evidence properly excluded, this aspect of defendant's claim of judicial bias also must fail.

### 7. Spousal Privilege Against Testifying

Defendant next argues the trial court erred when it refused to inform Billie McWhorter of the statutory privilege of one spouse not to be forced to testify against the other. (Evid. Code, §§ 970–971, 973.) The claim has no merit.

■■■ The spousal privilege is personal to the spouse seeking to avoid testifying, and because Billie, and not defendant, was the holder of the privilege, defendant does not have standing to raise the claim. (Evid. Code, § 918; see *People v. Lucas* (1995) 12 Cal.4th 415, 490 [48 Cal.Rptr.2d 525, 907 P.2d 373]; *Jurcoane v. Superior Court* (2001) 93 Cal.App.4th 886, 896 [113 Cal.Rptr.2d 483].) Defense counsel himself acknowledged this below. Moreover, it has been expressly recognized that a trial court does not have a duty to advise a witness of the spousal privilege. (*People v. Resendez* (1993)

12 Cal.App.4th 98, 106–108 [15 Cal.Rptr.2d 575].) As explained in *Resendez*, nothing precluded defense counsel from directly informing Billie of the privilege himself. (*Id.* at p. 109, fn. 6.) Defense counsel acknowledged this below as well. Finally, counsel waited until after the prosecutor had begun his direct examination of Billie to request the court to advise her of the spousal privilege. Billie was the holder of the privilege and, once she decided to testify at any point in defendant's criminal proceedings, the privilege was waived for the entirety of the proceedings. (See Evid. Code, § 973, subd. (a).)

### 8. *Shackling During Trial*

Defendant argues that although alerted to the fact that he was shackled while in the courtroom, the trial court failed to fulfill its duty to forbid physical restraints unless their use was manifestly necessary. (*People v. Hill* (1998) 17 Cal.4th 800, 841 [72 Cal.Rptr.2d 656, 952 P.2d 673].) The claim, too, is devoid of merit.

Before the first jury panel entered the courtroom, defense counsel requested that defendant be unshackled.[22] In response, the trial court ordered defendant's waist chains removed (and inferentially, the handcuffs to which they were attached) but did not order his leg restraints removed because defendant was seated at counsel table and thus the leg restraints could not be observed by others in the courtroom. There is no evidence in the record that any prospective juror observed defendant in the leg restraints on this single occasion. "We have consistently found any unjustified or unadmonished shackling harmless where there was no evidence it was seen by the jury." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 583–584 [15 Cal.Rptr.2d 382, 842 P.2d 1142].)

Moreover, although defense counsel made the request that defendant be unshackled, he thereafter acquiesced in the remedy selected by the trial court—removal of the visible waist chains—and made no further objection, thereby waiving any claim on appeal with respect to the absence of further inquiry into the manifest need for the concealed leg restraints. (*People v. Stankewitz* (1990) 51 Cal.3d 72, 95 [270 Cal.Rptr. 817, 793 P.2d 23]; *People v. Walker* (1988) 47 Cal.3d 605, 629 [253 Cal.Rptr. 863, 765 P.2d 70].)

Nor do we find any merit to defendant's further claim that the trial court "highlighted" the fact that he was in concealed leg restraints "by forcing [him] to sit when introduced." There is no evidence that anyone in the courtroom was aware defendant was in leg restraints when he remained

---

[22] There is no evidence in the record that defendant was shackled at any other time during his ensuing trial.

seated at counsel table as counsel stood up to be introduced to the prospective jury panel. Finally, as there is no evidence in the record that the two prospective jurors in the first panel who were ultimately seated on defendant's jury could see the leg restraints, there is no merit to defendant's further claim that the trial court committed reversible error "by failing sua sponte to instruct the jury to disregard [defendant's] physical restraints."

### 9. Flight Instruction

Defendant next contends the trial court erred when, over his objection, it instructed the jury with CALJIC No. 2.52 (flight after crime), "because the evidence showed without contradiction that [defendant] lived out of state and because the only evidence of flight was the fact that [defendant] did not remain in the area."

The jury was instructed with CALJIC No. 2.52, which informed it that if it found defendant fled, his flight was a circumstance it could consider when determining guilt.[23]

 At the threshold, we disagree with defendant's contention that he lived out of state at the time of the murders and, for that reason, the flight instruction was improperly given. At most, defendant traveled to Las Vegas and stayed with Billie's son, Eric Roesler, for several days before hitchhiking back to Bakersfield on Sunday, September 10, the day before Shirley and Joey were murdered. Defendant and Billie had not yet purchased the van in which they were later living in Las Vegas; it was purchased two days after the murders, on September 13. In any event, nothing in the standard flight instruction requires that it be proved a defendant "lived" in the area where his or her crimes were committed before an inference of guilt may properly be drawn from facts evidencing "flight."

A flight instruction is proper where the evidence shows a defendant departed the crime scene under circumstances suggesting his movement was motivated by a consciousness of guilt. (*People v. Smithey* (1999) 20 Cal.4th 936, 982 [86 Cal.Rptr.2d 243, 978 P.2d 1171]; *People v. Visciotti* (1992) 2 Cal.4th 1, 60 [5 Cal.Rptr.2d 495, 825 P.2d 388].) Within hours after the murders defendant announced to his family members at the Self/Amos residence in Oildale, which was in the vicinity of the Jordans' apartment, and to which he returned directly after killing Shirley and Joey, that he and Billie

[23] The jury was instructed as follows: "Now the law says that the flight of a person immediately after the commission of a crime or after he is accused of a crime is not sufficient in itself to establish his guilt. But, it is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide."

would be leaving for Las Vegas that same evening. Billie washed his clothes, defendant changed into clean clothes, and they took the 7:00 p.m. bus to Las Vegas. We conclude on this factual record that defendant's objection was correctly overruled and the flight instruction properly given.

Defendant also contends the flight instruction (CALJIC No. 2.52), as well as CALJIC No. 2.03, the instruction on consciousness of guilt, are both impermissibly argumentative pinpoint instructions that allow juries to draw improper inferences of guilt. The claim has been repeatedly rejected. (See, e.g., *People v. Stitely* (2005) 35 Cal.4th 514, 555 [26 Cal.Rptr.3d 1, 108 P.3d 182] [CALJIC No. 2.03]; *People v. Crew* (2003) 31 Cal.4th 822, 848–849 [3 Cal.Rptr.3d 733, 74 P.3d 820] [CALJIC Nos. 2.05, 2.52].) He further argues the flight instruction improperly allows "permissive inferences," i.e., authorizes the jury to draw an irrational inference of consciousness of guilt from flight. This claim too has previously been considered and rejected. (*People v. Mendoza* (2000) 24 Cal.4th 130, 179–180 [99 Cal.Rptr.2d 485, 6 P.3d 150].)

### 10. *Cumulative Prejudice*

Defendant asserts the cumulative effect of all the alleged guilt phase errors requires reversal of his convictions and, consequently, of his death judgment. We have found no error at the guilt phase. Accordingly, there is no cumulative effect of guilt phase errors for consideration in this case. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1255 [14 Cal.Rptr.2d 702, 842 P.2d 1].)

### C. Penalty Phase Issues

#### 1. *Two Multiple-murder Special Circumstances*

Defendant asserts it was error for the court to permit the jury to find true two multiple-murder special circumstances, one for each count of murder. He is correct. (See *People v. Beardslee* (1991) 53 Cal.3d 68, 117 [279 Cal.Rptr. 276, 806 P.2d 1311]; *People v. Warren* (1988) 45 Cal.3d 471, 489 [247 Cal.Rptr. 172, 754 P.2d 218].) He further argues the error prejudiced his penalty determination. We cannot agree. "We have consistently found such double counting harmless because it did not result in the jury considering any inadmissible evidence." (*Beardslee, supra*, 53 Cal.3d at p. 117.) Here, as in *Beardslee*, "[t]he jury knew there was a total of two murders. (*People v. Odle* (1988) 45 Cal.3d 386, 421–422 [247 Cal.Rptr. 137, 754 P.2d 184].)" (*Ibid.*)

#### 2. *Challenges to Constitutionality of Death Penalty Statute*

Defendant asserts numerous grounds in support of his claim that the California death penalty statute is unconstitutional. (See generally *People v.*

*Schmeck* (2005) 37 Cal.4th 240, 303–305 [33 Cal.Rptr.3d 397, 118 P.3d 451].) He acknowledges this court has previously rejected each of them, but raises them here in order to preserve the claims in federal court. (*Id.* at p. 303.)

The claim that section 190.3, factor (a), which allows the jury to consider "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1," is unconstitutionally vague and overbroad, resulting in the arbitrary and capricious imposition of the death penalty, has been rejected by the high court in *Tuilaepa v. California* (1994) 512 U.S. 967, 975–976 [129 L.Ed.2d 750, 114 S.Ct. 2630], and repeatedly rejected by this court. (See, e.g., *People v. Harris* (2005) 37 Cal.4th 310, 365 [33 Cal.Rptr.3d 509, 118 P.3d 545]; *People v. Stitely, supra,* 35 Cal.4th at p. 574; *Maury, supra,* 30 Cal.4th at p. 439; *People v. Lewis* (2001) 26 Cal.4th 334, 394 [110 Cal.Rptr.2d 272, 28 P.3d 34] (*Lewis*).)

The claims that allowing the jury to consider as an aggravating factor unadjudicated criminal activity involving force or violence under section 190.3, factor (b), violated defendant's federal constitutional rights to due process, equal protection, and a reliable penalty determination and, to the extent the evidence was permissible, that the failure to further instruct on the requirement of jury unanimity violated his rights to a jury trial and to a reliable penalty determination, have likewise been rejected in many prior decisions of this court. (See, e.g., *People v. Turner* (2004) 34 Cal.4th 406, 439 [20 Cal.Rptr.3d 182, 99 P.3d 505]; *People v. Brown* (2004) 33 Cal.4th 382, 401–402 [15 Cal.Rptr.3d 624, 93 P.3d 244].)

The claim that the failure to delete inapplicable statutory sentencing factors in CALJIC No. 8.85 introduced confusion, capriciousness, and unreliability into his penalty determination, in violation of the Eighth Amendment and defendant's other federal constitutional rights, has also previously been rejected by this court. (See, e.g., *People v. Dickey* (2005) 35 Cal.4th 884, 928 [28 Cal.Rptr.3d 647, 111 P.3d 921] (*Dickey*); *People v. Box* (2000) 23 Cal.4th 1153, 1217 [99 Cal.Rptr.2d 69, 5 P.3d 130] (*Box*).)

The claim that it was error not to identify for the jury which of the sentencing factors were aggravating, and which were mitigating, has likewise repeatedly been rejected. "The aggravating or mitigating nature of the factors is self-evident within the context of each case." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 509 [117 Cal.Rptr.2d 45, 40 P.3d 754]; see also *Dickey, supra,* 35 Cal.4th at p. 928; *Box, supra,* 23 Cal.4th at p. 1217.)

Nor does the use of adjectives such as "extreme" in section 190.3, factors (d) and (g), or "substantial" in section 190.3, factor (g), serve as an improper

barrier to the consideration of mitigating evidence. (*Lewis, supra,* 26 Cal.4th at p. 395; *People v. Visciotti, supra,* 2 Cal.4th 1, 73–75 ["extreme" as used in § 190.3, factor (g)]; *People v. Adcox* (1988) 47 Cal.3d 207, 270 [253 Cal.Rptr. 55, 763 P.2d 906] ["substantial" as used in § 190.3, factor (g)].)

The claim that California's death penalty statute unconstitutionally fails to define the burden of proof on whether an aggravating circumstance exists, whether the aggravating factors outweigh the mitigating factors, and whether death is the appropriate penalty, has previously been rejected by this court. (*Maury, supra,* 30 Cal.4th at p. 440.) Nor do the United States Supreme Court's decisions in *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], or *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] compel a different conclusion. (See *People v. Ward* (2005) 36 Cal.4th 186, 221 [30 Cal.Rptr.3d 464, 114 P.3d 717]; *People v. Morrison* (2004) 34 Cal.4th 698, 731 [21 Cal.Rptr.3d 682, 101 P.3d 568].)

Furthermore, "[t]he [death penalty] statute is not invalid for failing to require (1) written findings or unanimity as to aggravating factors, (2) proof of all aggravating factors beyond a reasonable doubt, (3) findings that aggravation outweighs mitigation beyond a reasonable doubt, or (4) findings that death is the appropriate penalty beyond a reasonable doubt." (*Snow, supra,* 30 Cal.4th at p. 126.) And except for prior violent crimes evidence and prior felony convictions under section 190.3, factors (b) and (c), the court need not instruct regarding a burden of proof, or instruct the jury that there is no burden of proof at the penalty phase. (*Box, supra,* 23 Cal.4th at p. 1216; *People v. Carpenter, supra,* 15 Cal.4th at pp. 417–418.) Nor is it error to fail to instruct the jury there is a "presumption of life" at the penalty phase of the trial, analogous to the presumption of innocence at the guilt phase (*People v. Avila* (2006) 38 Cal.4th 491, 615 [43 Cal.Rptr.3d 1, 133 P.3d 1076] (*Avila*); *People v. Perry* (2006) 38 Cal.4th 302, 321 [42 Cal.Rptr.3d 30, 132 P.3d 235]), or that if they determine mitigating evidence outweighs aggravating evidence, they must return a sentence of life without parole (*People v. Moon* (2005) 37 Cal.4th 1, 42 [32 Cal.Rptr.3d 894, 117 P.3d 591]).

Nor is there a requirement that California's death penalty sentencing scheme provide for intercase proportionality review. (See, e.g., *People v. Sapp* (2003) 31 Cal.4th 240, 317 [2 Cal.Rptr.3d 554, 73 P.3d 433].)

Finally, as this court has repeatedly held, California's death penalty statute neither constitutes cruel and unusual punishment under the Eighth Amendment (*People v. Guerra* (2006) 37 Cal.4th 1067, 1164 [40 Cal.Rptr.3d 118, 129 P.3d 321]; *People v. Fairbank* (1997) 16 Cal.4th 1223, 1255 [69 Cal.Rptr.2d 784, 947 P.2d 1321]) nor violates international law (*Avila, supra,* 38 Cal.4th at p. 615; *People v. Boyer* (2006) 38 Cal.4th 412, 489–490 [42 Cal.Rptr.3d 677, 133 P.3d 581]).

3. *Improper Imposition of Parole Revocation Restitution Fine*

Defendant last claims that because his sentence did not include a period of parole, the trial court erred in imposing and then staying a $200 parole revocation restitution fine pursuant to section 1202.45. He is correct. (See *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1184–1185 [83 Cal.Rptr.2d 157].) Respondent has conceded the point. We shall therefore order the fine stricken and the judgment modified to so reflect.

### III. CONCLUSION

The judgment is modified to reflect the striking of one multiple-murder special circumstance and the parole revocation restitution fine imposed pursuant to section 1202.45. In all other respects the judgment is affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied October 14, 2009, and the opinion was modified to read as printed above.